[Civ. No. 20605. Second Dist., Div. One. Sept. 20, 1955.]

KEITH STAGGS et al., Appellants, v. ATCHISON, TO-
PEKA AND SANTA FE RAILWAY COMPANY (a
Corporation), Respondent.

494

Demler & Eckert and William T. Dalessi for Appellants.

Robert H. Walker and J. H. Cummins for Respondent.

WHITE, P. J.—Plaintiff, Donald Staggs, a minor by his guardian ad litem, and plaintiff Keith Staggs, his father, have appealed from the judgment on verdict in favor of defendant. The first cause of action is by Donald alone for personal injuries suffered by him when he was struck by one of defendant's trains on August 18, 1951. Donald was then 21 months old. The second cause of action is by Keith alone for special damages including medical and other expenditures and debts incurred because of Donald's physical and mental condition after the accident.

Defendant by its answer admits that Donald suffered a skull fracture and other serious injuries when he was struck by some part of the engine of its 57-car freight train at the time and place referred to in the complaint. An affirmative defense relied upon is "that said parents' neglect permitted him to walk or crawl, or both, several hundred feet from his place of abode to the embankment and private railroad right-of-way of the defendant . . . and the neglect of said parents proximately caused and contributed to the accident."

The appeals will be considered separately. ■ As a matter of law, 21 months' old Donald was incapable of contributory negligence, and his parents' negligence, if any, cannot be imputed to him. The jury was so instructed. ■ Therefore, defendant's liability to Donald depends entirely on whether any negligence of defendant proximately caused Donald's injuries. Whether defendant was guilty of negligence toward Donald depends upon the duty, if any, owed by it to him, which, in turn, depends upon whether defendant's employees had reason to expect the presence of human beings upon the tracks or right-of-way at the time and place of the accident.

The site of the accident was Monaco Hill in Lawndale, a well-settled unincorporated residence district between Los Angeles and Torrance on the Santa Fe's Harbor Line. There is evidence that the accident occurred from 8 to 40 feet north of a well-beaten pathway across the tracks at 165th Street,

which dead-ends on each side of the tracks. The nearest streets which crossed the tracks were 162nd on the north and 180th on the south. None of the numbered streets between 162nd and 180th crossed the tracks, but at each such dead-end street and at numerous places between them were footpaths crossing the tracks. The uncontroverted evidence is that the general public, both adults and children, had walked across, upon and along defendant's roadbed in that locale for many years, that children not only walked along the paths, ties and tracks, but also played on all parts of the right-of-way through that district. Three trains used the track daily, one in the early morning, one about midnight, and one in midafternoon. Other unscheduled trains sometimes used it. The weeds had been burned off the right-of-way a few days before the accident. Donald's injuries were caused by a southbound train about 3:30 in the afternoon of a bright, clear day. The railroad was straight from about 160th Street to the site of the accident, which was clearly visible for that distance, about 1,500 feet. The speed of the train was between 16 and 20 miles an hour. There were three men in the cab, two looking forward through the front windows, and one looking back along the train. The train was stopped in approximately 300 feet—one block—after the brakes were applied a few feet from the point of the impact. That was the usual distance required to stop a train of that weight and speed when climbing that grade.

The engineer testified that he had never before seen any child so young as Donald playing unattended along the tracks. The neighbors who testified as witnesses called by plaintiff did not remember seeing one so young alone on the tracks, but said it was not unusual to see a "toddler" with an older child crossing the tracks or playing there. Several testified that, in spite of constant watchfulness and discipline, on occasions they had found their own children on the right-of-way or tracks. Once, about a month before the accident, Donald had been found there by his mother, who had spanked him and taken him home.

Defendant's conductor, who had been over this road in defendant's employ for 28 years and had "worked that district" from 1942 to 1953, said the footpath had crossed the railroad at 165th Street even before 1942, and further testified:

"Q. Have you to your own knowledge known that pedestrians, both adults and school children, have passed across

the tracks from one side of the tracks to the other on 165th Street? A. Oh, yes. That is common practice.

"Q. And they have done that now for how many years? A. I can't say exactly for how many years. Probably 15. Maybe 20. As long as I can remember about it there has been a footpath across there.

. . . . . . . . . . .

"Q. Are you familiar with children, whether or not they play at other places along the Harbor Line? A. Oh, yes. There are other places where they play, but it is particularly attractive at that point, at Monaco because the trains, on account of the grade, move through there slow and it is a temptation for these kids to hitch a ride up the hill.

"Q. That is for the larger children? A. They don't have to be too large. I have seen them on there when they can just walk, hanging on the stirrup on the corner of a car with their feet dragging."

Defendant's Superintendent of the Special Services for the Coast Lines testified that he had been familiar with the problem of children on the tracks in the Lawndale district since 1948. The following is quoted from his testimony on cross-examination:

"Q. Mr. Hastings, from your experience then you know that the railway trains themselves and the tracks are quite attractive to children there; they are attracted by them to the extent they want to play on the trains and crawl over them, crawl under them, stand in front of them until the train gets there and jump aside and so on? A. That is correct.

"Q. They put pennies on the rails, they put rocks on the rails and they do all sorts of things? A. Yes.

"Q. So you have sort of learned to expect children on the rails, haven't you? A. I have.

"Q. These reports you have are relative to children playing on the tracks and hopping trains and things like that, aren't they? A. They are.

"Q. You know that to be a danger to them? A. I most definitely do.

"Q. Some of those children were boys of 5 to 6 years old, I believe, weren't they? A. That is right.

"Q. And I suppose you, yourself, have seen children 2 and 3 and 4 years old on the tracks, too? A. I have.

. . . . . . . . . . .

"Q. Your job is to keep them off the tracks, too? A. To keep them off the tracks, yes.

"Q. What has been accomplished between 162nd Street and 180th Street, say in Lawndale, if it goes that far, with reference to keeping the children off of the tracks? A. They are still playing on the tracks, counsel . . ."

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Then this area, as an employee and an agent of this train company, you knew that all along through Lawndale there were paths in 1951, August of 1951, giving access to the train tracks themselves; is that true? A. That is right.

"Q. Those were made by children and grown-ups walking across the right of way, weren't they? A. That is right.

"Q. And being familiar as you were, I suppose, during that time with this right-of-way here in Lawndale, you knew that children not only walked across, but walked up and down the paths; isn't that true? A. I do.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Well, speaking of, say, from 162nd to 175th or 180th, whatever it might be in there, have you ever seen children playing alongside the railway tracks? A. Yes, I have seen them playing alongside the railway tracks."

Such quotations from the transcript could go on at great length, but the foregoing is a fair sample. There is no testimony by any member of the train crew to the effect that he did not know the track and right-of-way through the Lawndale-Monaco Hill District was likely to be occupied in the daytime by children, as well as adults.

The record shows further without conflict that the edges of the right-of-way through the Lawndale District were unmarked; that there was no fence or line of any kind showing what portion of the land adjacent to defendant's roadbed belonged to defendant and what portion belonged to others; that defendant's employees who testified did not know the width or boundary of the right-of-way; that the right-of-way was not and probably never had been posted even at the dead-end streets with "private property," "no trespassing," "danger," "railroad" or "keep off" signs.

Also without conflict it is shown by the record that occasionally, during several years before the accident now being considered, defendant's trainmen had apprehended children placing objects on the tracks, throwing stones at the train, touching it with sticks, boarding or attempting to board it. Those children had been talked to, taken home, and their conduct reported to their parents. In some instances reports had been made to the local police. Motion pictures had been

furnished the schools to be shown to the children in an effort to teach them the dangers incident to play on the tracks. Occasionally the district had been patrolled by officers in an automobile, who had warned some children and parents. No effort had ever been made to prevent the use of the right-of-way by pedestrians, or by children at play except when they placed things on the tracks or attempted to touch the trains.

Appellants first urge as a ground for reversal that, as a matter of law, the evidence is insufficient to support a verdict in favor of respondent and against the minor plaintiff. Under the circumstances of the instant action defendant's negligence was not a question of law. It was a question of fact to be determined by the jury.

The other grounds for reversal assigned by appellants are that certain instructions were improperly given to the jury.

General instructions concerning negligence and proximate cause were given. The court defined "licensee" and "trespasser" and instructed as to the defendant's duty, or lack of duty, to each. The jury was further instructed that ". . . The aimless toddling of a child does not deprive it of the duty owed to any other licensee"; and that defendant "owes no greater duty to discover an infant trespasser than it does to discover an adult trespasser, if you find that Donny was a trespasser."

The jury was further instructed that the landowner need exercise no care for the safety of a trespasser, "except only that when a land-owner learns that a trespasser is in a dangerous position, he, the owner, is bound to exercise ordinary care to avoid injuring the trespasser."

Appellant assigns as prejudicial error the giving of the instruction next following: "In determining whether the plaintiff was a trespasser or licensee, you are instructed that *a mere toleration of continued intrusion on defendant's lands where objection or interference would be burdensome or likely to be futile, is not of itself a manifestation of consent.*" (Emphasis added.)

Appellant urges that, as a matter of law, Donald was a licensee and respondent owed him a duty to use reasonable care to discover him on the track in time to avoid injuring him; and respondent contends that "under all of the circumstances the injured child was a trespasser as a matter of law. Certainly, and at the very least, defendant was entitled to have the jury decide the issue of liability."

■ Where there is conflicting evidence regarding the facts and circumstances, and where it is material to the issues being tried, plaintiff's status as licensee or trespasser is a question of fact for the jury to determine under proper instructions as to the applicable law.

From a careful review of the cases cited, and others too numerous to mention, it appears that an injured plaintiff's status as trespasser or licensee upon defendant railroad's premises has been material for two reasons: (1) If plaintiff is a trespasser, his presence upon the tracks and failure to get off when a train is approaching is evidence of contributory negligence; and (2) If plaintiff is a trespasser, defendant railroad has no reason to expect him to be where he is and, as against such trespasser, defendant may rely upon a clear track through its private right-of-way.

■ In the instant action, Donald's status is immaterial on the question of contributory negligence, because, as a matter of law, Donald could not be charged with negligence and the jury was so instructed. Donald's status is likewise immaterial on the question of defendant's right to take for granted a clear right-of-way through Lawndale. The record on the appeal now engaging our attention shows without conflict that defendant's trainmen had "learned to expect children" and adults on the tracks and right-of-way at the time and place of the accident, and—whether such persons were licensees or trespassers—the railroad had no basis for reliance upon a clear track.

■ At the time and place of the accident, it appears also without conflict that the long continued use by the public (with the knowledge of, and without objection by, defendant) negatived defendant's claim to the exclusive use of its right-of-way unobstructed by pedestrians; and that, regardless of Donald's status, defendant did owe to the public, including Donald, the exercise of ordinary care in operating its trains through the district. (*Smithwick* v. *Pacific Elec. Ry. Co.,* 206 Cal. 291, 303 [274 P. 980]; *Hilyar* v. *Union Ice Co.,* 45 Cal.2d 30, 36 [286 P.2d 21]; *Kading* v. *Willis, ante,* pp. 82, 87 [286 P.2d 861].) Therefore, in the instant action, the jury "could easily have been confused by the instructions given them requiring that they determine Donald's status as licensee or trespasser, that "a mere toleration of continued intrusion on defendant's lands where objection or interference would be burdensome or likely to be futile, is not of itself a manifestation of consent," and that "a rail-

road owes no duty to maintain a lookout to avoid injuring a trespasser on its private right of way." Those instructions were not applicable to the facts of the instant action and should not have been given.

We are aware of the many decisions of the California courts in which the statement is made that no care is owed to a trespasser, adult or child, except after actual knowledge of his presence. However, the facts in those cases are distinguishable from the facts shown by the record in the instant appeal.

In many of such decisions, as in *Tennenbrock* v. *South Pac. Coast R. Co.*, 59 Cal. 269, where the plaintiff was injured while walking on a trestle across a ravine in the mountains far from any village or settlement, there is no indication that the railroad had ever been so used before or that defendant had any reason to anticipate the presence of anyone.

In others, such as *Wilson* v. *City of Long Beach*, 71 Cal. App.2d 235 [162 P.2d 658, 163 P.2d 501], where a 6-year-old boy with a crowd of other children playing on street working equipment was warned to get off because it was about to be moved, two of defendant's employees looked and did not see him on the machine when movement was started, and the other children had warned the injured boy as they moved to a safe place, the defendants had actually exercised ordinary care for the safety of those known to be trespassing and had no reason to expect anyone to be where plaintiff was at the time he was injured.

In the one line of cases, no lookout was required; and in the other a reasonably careful course of procedure had been followed which had proved sufficient for the protection of all others in the same situation as plaintiff. In none of such cases had the defendant "learned to expect" members of the public to be present at the time and place of the injury.

In the instant action, the first question to be determined by the jury is not the status of the infant plaintiff, which is immaterial under the uncontroverted facts, but what was the "ordinary care or skill" in the operation and management of its train in the locale of the accident required of defendant, considering all the surrounding facts and circumstances, including the knowledge of defendant's agents and trainmen that members of the public, adults and children, were likely to be there at that time. (Civ. Code, § 1714.) Whether such "ordinary care or skill" included a watchful-

ness at said time and place for children in places of danger on or near the tracks was for the jury to determine.

Appellant contends that the court committed further prejudicial error in instructing the jury on the doctrine of imminent peril, for the reason that from the time when Donald's imminent peril was seen "there was nothing that any human being could have done to avoid the accident," and the jury was confused by instruction on "that abstract theory of law." Respondent offers as justification for that instruction the possibility that the jury might have thought "a whistle should have been sounded."

The only evidence that any of defendant's employees saw the danger to plaintiff Donald at any time before he was hit by the train was the testimony of the fireman, whose duty at the time of the accident was to look out the left front window of the engine. He testified that he first saw what appeared to be a child on the ties just outside the left track when "the front end of the engine, the pilot or the footboard" was "20 or maybe 30 feet" from it. The fireman further testified that "I immediately jumped down into the deck and hollered for my engineer to go into the big hole." The train was immediately put into full emergency and stopped as quickly as possible.

At the speed of the train, from 16 to 20 miles an hour, the engine was moving from 25 to 30 feet per second. Considering the testimony in the record regarding the necessary reaction time of one to three seconds, and the facts that the child's danger was observed only by the fireman who had no control of either whistle or brakes, it is futile to expect that, even if the whistle could have been sounded before the impact, there would have remained time enough for any human being to save himself.

As authority for the giving of the instruction on imminent peril in the instant action, respondent cites *Leo* v. *Dunham,* 41 Cal.2d 712 [264 P.2d 1]. In that case the truck driver who collided with a pedestrian upon realizing the danger "applied his brakes, 'hollered,' and swerved to his right." Certainly he had a choice. He could have gone straight ahead, or perhaps swerved to his left.

"Cases in which such an instruction is applicable involve situations where *at least two courses of action are present after the danger is perceived and where no negligence is chargeable to the person to whom those courses of action are open.*" (Emphasis added.) (*Perry* v. *Piombo,* 73 Cal.App.

2d 569, 572 [166 P.2d 888]; *Connor* v. *Pacific Greyhound Lines,* 104 Cal.App.2d 746, 757 [232 P.2d 500].)

The record on the appeal in the case at bar shows without conflict that defendant's agents, after Donald's peril was observed, could not have avoided the accident or in any manner have lessened his injuries. The instruction on imminent peril is inapplicable for that reason. The jury had a right to assume that the court deemed it to be applicable to the issues being tried or the court would not have so instructed them. The giving of that instruction may have misled and confused the jury . . . It was therefore prejudicial error. (*Scandalis* v. *Jenny,* 132 Cal.App. 307, 313 [22 P.2d 545]; *Davenport* v. *Stratton,* 24 Cal.2d 232, 254 [149 P.2d 4].)

■ Appellant assigns as further error, certain instructions given at the request of respondent, as follows:

"There is no statutory law or ordinance requiring defendant railroad to fence its right of way at or near 165th Street.

"At some points along its right of way a railroad company has no right to erect a fence. For example, they cannot fence on the sides of their road across a public highway transecting it nor across a prescriptive right of way for pedestrian travel.

"A prescriptive right to pass over the land of another ripens into an easement by adverse possession for a period of five years. Open, visible and notorious adverse possession raises a presumption of notice of an adverse claim of prescriptive right of a pedestrian to pass over the land of another. To constitute adverse possession, use of a pathway by a pedestrian must have been actual, open, continuous and under a claim of right, adverse and hostile to the true owner's title.

"If you find that pedestrians had a prescriptive right to cross defendant's tracks at 165th Street, you are instructed that defendant railroad had no right to fence or barricade such prescriptive way.

"A railroad's building of a fence along its right of way would be regarded as a mere voluntary act. In the absence of statute or ordinance requiring the fence, and hence absence of a fence or failure to maintain a fence could not operate to confer greater rights upon trespassers."

Appellant cites and relies upon *Ford* v. *Chesley Transp. Co.,* 101 Cal.App.2d 548, 554 [225 P.2d 997], in support of his contention that the giving of the above quoted instructions

was prejudicial error. Respondent points out that the erroneous instruction in the Ford case, *supra*, told the jury "there is no law" while the one here complained of instructs that "there is no statutory law or ordinance" and was therefore correct.

Actually, there is the following California statute:

Section 7626 of the Public Utilities Code of California provides: "Every railroad corporation shall make and maintain a good and sufficient fence on both sides of its track and property. If it does not and if its engine or cars kill or maim any cattle or other domestic animals upon its line of road, . . . it shall pay to the owner of the cattle or other domestic animals a fair market price for them, unless the killing or maiming occurred through the neglect or fault of the owner of the animal."

It has been decided in other states that similar statutes do not require fencing against children. (*Walkenhauer* v. *Chicago, B. & Q. R. Co.* (1882), 17 F. 136 [3 McCrary 553]; *Nixon* v. *Montana W. & S. R. Co.* (1914), 50 Mont. 95 [145 P. 8, Ann.Cas. 1916B 299].) But statutes intended primarily for the protection of stock and railroad passengers have also been so construed as to bring within their scope children of tender years straying on the right-of-way, at least to the extent that the absence of the required fence is some evidence of negligence. (*Chicago, B. & Q. R. Co.* v. *Grablin* (1893), 38 Neb. 90 [56 N.W. 796, 57 N.W. 522]; *Isabel* v. *Hannibal & St. J. R. Co.* (1875), 60 Mo. 475; *Keyser* v. *Chicago & G. T. R. Co.* (1887), 66 Mich. 390 [33 N.W. 867]; *Marcott* v. *Marquette H. & O. R. Co.* (1881), 47 Mich. 1, 9 [10 N.W. 53], and later appeal in (1882) 49 Mich. 99 [13 N.W. 374].)

In *Hynes* v. *San Francisco & N. P. R. Co.* (1884), 65 Cal. 316, 318, 319 [4 P. 28], where a horse was killed and its rider injured, the California Supreme Court said:

"It is obvious that the purpose of the statute in requiring railway companies to make and maintain such fences is to prevent collisions with cattle and other domestic animals, and that it has no application to ordinary cases in which an individual suffers any injury. The statute having imposed on the defendant the duty of making and maintaining the fences, and defendant having wholly failed in its duty in that particular, there can be no doubt, we think, of the liability of defendant for the loss of the horse, . . . So here . . . no reason is perceived why it is not also liable for the injury to the boy carried on the back of the runaway horse."

No California decision regarding the railroad's duty to fence its tracks, on facts at all similar to those now before this court has been cited. Independent research has failed to discover one. "Everyone is responsible . . . for an injury occasioned to another by his want of ordinary care or skill in the management of his property . . ." (Civ. Code, § 1714.) As pointed out by appellant even if the jury was convinced that, under all the circumstances of the instant action, ordinary care on the part of defendant would have included the erection and maintenance of good and sufficient fences through the Lawndale district, because of the instruction that the "building of a fence . . . would be regarded as a *mere* voluntary act" the jury may have concluded that it could not consider the absence of a fence as any evidence of negligence.

Prior to the 1915 amendment of the fencing statute which is hereinbefore quoted as it is now and was at the time of the injury to Donald, only the owners of the land adjoining the right of way could collect for the killing of their animals. After the amendment it has been held that the fact that an animal was killed or maimed by a train and the absence of a fence makes a prima facie case. While no such provision is made for a small child to recover for his personal injuries, there is nothing in the statute which limits the railroad's responsibility for such injuries in a case where the jury might determine that ordinary care required the railroad to fence its right-of-way from 162nd Street to 180th Street through the Lawndale district and that the absence of such fence, either alone or in connection with other negligence of defendant, proximately caused the accident. The instruction as given was therefore not a fair statement of the law it sought to expound.

The instructions above quoted that "At some points along its right of way a railroad company has no right to erect a fence . . . etc. . . . ." merely added to the confusion of the jury under the other instructions hereinbefore discussed. The fact that the railroad has no right to fence across a public highway is beyond the issues. From the record on the instant appeal, it appears without conflict that no public highway crossed the railroad between 162nd Street and 180th Street at the time of the accident or at any other time. Admittedly Donald lived on 166th Street and the accident occurred at 165th Street.

No "prescriptive right of way for pedestrian travel" or "easement by adverse possession" was in issue in the instant

action. And, if such "easement by adverse possession" had been here in issue, the jury should have been instructed that a railway right-of-way is such a public way as to prevent the acquisition of a prescriptive title to or easement over any part thereof in favor of private persons, and such use of the paths and tracks must be deemed permissive. (*Southern Pac. Co.* v. *Hyatt*, 132 Cal. 240, 244 [64 P. 272, 54 L.R.A. 522]; *Central Pac. R. Co.* v. *Droge*, 171 Cal. 32, 40 [151 P. 663].)

While Donald because of his age is conclusively presumed to have been free from negligence, such presumption cannot be used in proving negligence on the part of the defendant. Every accident does not entitle the injured to recover damages from someone. There is no presumption that the railroad was negligent. Unless some negligent act or omission on the part of defendant was a proximate cause of plaintiff's injuries, defendant is not liable in damages. (*Greene* v. *Atchison, T. & S. F. Ry. Co.*, 120 Cal. App.2d 135, 139 [260 P.2d 834, 40 A.L.R.2d 873]; *Mautino* v. *Sutter Hospital Assn.*, 211 Cal. 556, 561 [296 P. 76].) In the Greene case, *supra*, it was said that, while an engineer, like a motorist or pedestrian, is presumed to see what is in range of his vision, he could not there be presumed to have seen the decedent or to have looked negligently; and the record on that appeal was as a matter of law insufficient to show his negligence, because in that case no witness saw the decedent on or near the track until half an hour after the train had gone by.

We cannot say, as a matter of law, that the record on the instant appeal is insufficient to support a finding of negligence by defendant. Here, Donald was seen on or near the site of the accident by the witness, Ward Orsted, several minutes before, by the fireman when the front end of the engine was 20 to 30 feet from him, and, no doubt, from the testimony of the trainmen themselves, both the engineer and the fireman saw him between the ties when the train was considerable distance from him, one believing he was "a newspaper" and the other "a bundle of rags," and neither paying any more attention to the "object."

It was the duty of the jury who heard all the evidence, visited the site of the accident, and examined the right-of-way and the engine to determine whether defendant's agents had used ordinary care in the operation of the train under the circumstances shown. However, because of the inapplicable

instructions given to them, we cannot determine whether their verdict was based upon a finding that defendant used ordinary care or a finding that defendant owed no duty to exercise any degree of care towards Donald.

The judgment is reversed.

Drapeau, J., and Doran, J., concurred.

A petition for a rehearing was denied October 17, 1955, and respondent's petition for a hearing by the Supreme Court was denied November 16, 1955.