[Civ. No. 454.   Fifth Dist.   Nov. 23, 1965.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC
WORKS, Plaintiff and Appellant, v. D. R. LUNDY et al.,
Defendants and Respondents.

Harry S. Fenton, Holloway Jones, Jack M. Howard, Lee Tyler, William R. Edgar and David P. Weaver, Jr., for Plaintiff and Appellant.

Conron, Heard, James & Hamilton and Calvin H. Conron, Jr., for Defendants and Respondents.

CONLEY, P. J.—The Department of Public Works, desiring to improve highway 99 in a part of Kern County by making it a freeway, filed an action in eminent domain to acquire property owned by the Lundy family. The case

involved two parcels of land west of the proposed freeway and the Southern Pacific Company track which paralleled it, one being 358 acres of farm property, the other a potato packing shed; two railway crossings were also involved (parcels 5 and 9B), one leading from the highway across the Southern Pacific right of way to the farm property, the other crossing the rails to the packing shed. The judgment determined that upon the payment into court of $39,928.40, besides the $9,148.60 already deposited by plaintiff with the State Treasurer as security for the taking of possession of the parcels described in the complaint, plus interest, ". . . there shall be condemned to plaintiff for State highway purposes in fee simple absolute all the real property described as Parcel 9A in the complaint . . . and . . . all the easements of access in and to the existing State highway as described in the complaint herein as Parcels 5 and 9B" together with costs.

The farm land, which is about a half mile from the shed, lies approximately 7½ miles north of Bakersfield. It has been irrigated for the growing of row crops. The more southerly parcel contains 1.782 acres; it is the site of the potato packing shed, which, since 1958, has been used for storage. The closing off of the two existing means of access from the highway prevents the use by the Lundys of the crossings which they previously used. Although the two parcels are not contiguous to 99, because of the intervening railroad, ingress and egress to and from highway 99 was possible by means of these two crossings.

In connection with the condemnation, the state built a road which passes through the Lundys' ranch land; it cul-de-sac's at the northeasterly end of the farm, and gives access to a county road which intersects the new freeway about a mile south of the Lundys' ranch parcel. To construct this interior road, the state condemned 3.617 acres of land in fee; this road is improved with two 12-foot paved lanes and 10-foot shoulders; the Lundys have access to both sides of the new road for the ½-mile that it passes through the ranch parcel; a concrete pad was built across the road at one point to permit the transfer of heavy equipment from one part of the farm to the other; as a result of the construction of this road 87 acres of farm land lie east of it and 267 acres to the west.

Before the valuation issue was tried by the jury, the question was first determined by the court (Judge Gargano pre-

siding) whether the railroad crossings were a ''property interest''; there were no grants of access rights across the railroad right of way to highway 99; these crossings were not county roads and were not maintained by the county; and the ranch crossing had been posted by a sign ''Private property—permission to pass over revocable at any time,'' although from time to time the sign had been torn down. The railroad was constructed as a result of the congressional grant in the year 1866. Judge Gargano ruled that the Lundys had a ''compensable property right'' in the crossings in the nature of a ''quasi-public easement'' created by virtue of Public Utilities Code, section 7537.

That section reads as follows: § 7537. ''The owner of any lands along or through which any railroad is constructed or maintained, may have such farm or private crossings over the railroad and railroad right of way as are reasonably necessary or convenient for ingress to or egress from such lands, or in order to connect such lands with other adjacent lands of the owner. The owner or operator of the railroad shall construct and at all times maintain such farm or private crossing in a good, safe, and passable condition. The commission shall have the authority to determine the necessity for any crossing and the place, manner, and conditions under which the crossing shall be constructed and maintained, and shall fix and assess the cost and expense thereof.''

■ Under the law and the facts, the defendants merely had a revocable license to cross the railroad property at the two points involved; they did not own easements but only had licenses to cross the right of way; there was, therefore, nothing to condemn, and the case was improperly tried both because of the assumption that there were property rights in the two crossings and because of the consideration of the loss of these alleged rights by the jury in ascertaining the damage to the remaining property.

■ A prerequisite to compensation is that a claimant must prove his ownership of an estate or interest in the land being condemned. (*Brick* v. *Cazaux*, 9 Cal.2d 549, 555 [71 P.2d 588]; *East Bay Municipal Utility Dist.* v. *Kieffer*, 99 Cal.App. 240 [278 P. 476, 279 P. 178]; 2 Nichols on Eminent Domain (rev. 3d ed. 1963) § 5.23, pp. 73-74 and § 5.72, p. 108.)

■ No deed or contract with the railroad company gave any easement to the Lundys; neither did any holding of the Public Utilities Commission. ■ And adverse possession

may not be urged as the use of the crossings was not adverse, but by permission, and, in any event, title by adverse possession across an active railroad right of way cannot be acquired by individuals. (*Southern Pac. Co.* v. *Hyatt*, 132 Cal. 240 [64 P. 272, 54 L.R.A. 522].)

In *Staggs* v. *Atchison, Topeka & S.F. Ry. Co.*, 135 Cal. App.2d 492, 506 [287 P.2d 817], it was stated: ". . . a railway right-of-way is such a public way as to prevent the acquisition of a prescriptive title to or easement over any part thereof in favor of private persons, . . ."

A revocable license is the highest possible legal status characterizing the Lundys' ability to cross Southern Pacific's right of way. Such a license creates no property interest. (*Eastman* v. *Piper*, 68 Cal.App. 554, 560 [229 P. 1002].) Licenses, or privileges, which are unenforceable against the fee owner, are not proper subjects of condemnation.

The court was also in error in ruling that section 7537 of the Public Utilities Code created a "quasi-public easement" in the crossings, because the Public Utilities Commission has not exercised its power to authorize a crossing of any kind at that point, and there is no document or act by the railroad company creating such an easement. After the court improperly ruled that respondents had a compensable right of access to the highway it compounded its error by instructing the jury that respondents' land possessed an abutter's easement of access to the highway in four different instructions. The Lundy property did not abut on the highway, but on the railroad right of way; an easement of access to the highway was, at least originally, possessed by the Southern Pacific Company as its property abuts on the highway.

It is only with respect to property rights that the Constitution and the laws of this state require that the state shall pay a just compensation upon condemnation. (Cal. Const., art I, § 14; Code Civ. Proc., §§ 1239, 1240.) Therefore, the award of damages, small as it is, for abolishing the licenses to effect a crossing of the railroad is the result of a mistaken view of the law. The same conclusion, also, must necessarily follow as to the damages found by the jury with respect to the effect on the land not taken by the state.

Another point urged for a reversal is that much evidence was permitted that did not conform with the basic rule of proof of damage in an eminent domain proceeding. The

fundamental rule in proving damage for the taking of specific land is the difference between its reasonable market value before and after the taking. In addition, severance damages must be ascertained "If the property sought to be condemned constitutes only a part of a larger parcel" and damage accrues to the remaining land by reason of the severance. (Code Civ. Proc., § 1248, subd. 2.) Proof of the difference in reasonable market value of the remaining land before and after the taking is the proper method of solution. Any increase in the personal difficulties of a landowner, or his lessee, as such, by reason of the taking, apart from the market value, is not a proper test of damages; the difference in the amounts of money which an individual would be willing to pay for a lease, or for title, before and after the taking, as distinguished from what the general public would pay as reasonable market value, is immaterial. The appellant claims, with justice, that this fundamental rule was not observed in numerous rulings of the trial court, and that the Lundys, in part at least, sought to use a subjective rather than an objective theory of market value in that Dick Lundy and Wayne Payne, the lessee, enumerated the various agricultural operations that they would have to perform in the cultivation of cotton on the land and the additional equipment and time which would become necessary because of the separation of the ranch by the new road. When the cost of this additional time was originally inquired into, the court sustained appellant's objection. But Wayne Payne was asked about extra financial costs which he would have to expend to operate the ranch in its divided state and at that time the additional cost of these operations was allowed in evidence; Payne testified that instead of making one long run across the land to perform his cultivation, the division of the ranch by the new road required him to make two additional turns, one on each side of the new road and that these added turns numbered 660 per operation; based upon his estimated time of one minute per turn, these totaled 11 additional hours per operation, and the additional time per year equalled 275 hours, or 11 hours multiplied by the 25 operations which he performed annually while cultivating the cotton; he also testified that the added cost for labor and equipment amounted to about $2,500 per year. The court thus allowed Payne to base his opinion of severance damages upon personal factors unrelated to an objective standard of market value. Payne's approach was really an argument that he would suffer

increased costs with resulting decrease in profit, and, consequently, that the land to him was worth less.

Appellant also properly complains of Payne's testimony as to an increase in his own travel time to various locations, and argues that this inconvenience to Payne was not compensable, citing *Rose* v. *State of California,* 19 Cal.2d 713, 739 [123 P.2d 505] and *Holman* v. *State of California,* 97 Cal.App.2d 237 [217 P.2d 448].

Unquestionably, the court failed to hold a tight rein on the damage evidence that was admitted; the testimony of the lessee, Payne, violated fundamental rules of proof. It could make no difference whether Payne would have paid less for a lease or less for the land in the specified respects as to which he testified. The test of proper proof always is reasonable market value payable by purchasers generally. For this additional reason, the case was improperly tried, and a reversal must follow.

Appellant also contends that respondents' counsel committed prejudicial misconduct in moving to amend respondents' answer in the presence of the jury so as to increase by $100,000 the value of the land and in later arguing to the jury that the court had allowed this amendment. (*Sanguinetti* v. *Moore Dry Dock Co.,* 36 Cal.2d 812 [228 P.2d 557].)

By their verified amended answer, respondents alleged that the value of their entire property was $400,000, and that the severance damages caused to the remaining land by the taking was $75,000. But during the trial, Dick Lundy, the respondent who had verified the pleading, testified on direct examination that, in his opinion, the value of the property before condemnation was $500,000 and that after condemnation the land would be diminished in value by $100,000. In the jury's presence, respondents' counsel made a motion "to amend the answer by increasing the value of the ranch to the sum of . . . ." Appellant objected, cutting off counsel's statement, and arguing that such motion in the jury's presence was improper. The court said it would hear the parties in chambers. Nevertheless respondents' counsel stated in the jury's presence, "Well, the motion is to amend to conform to the present testimony." In chambers, and without objection, the court allowed the amendment by interlineation so that the value of the entire property was then alleged to be $500,000 and the claimed severance damages were changed to $100,000.

Appellant now argues that counsel for respondents

". . . deliberately sought to achieve the misleading impression condemned by the Supreme Court in *Sanguinetti,*" *supra,* namely, that if the trial court should grant the motion to amend it would indicate that damages should be increased, and that the error was aggravated by the reference to the amendment in the later argument to the jury. Were it not for the holding in *Sanguinetti* v. *Moore Dry Dock Co., supra,* 36 Cal.2d 812, this court would overrule the objection on appeal. Everyone recognizes in a contested case that the plaintiffs often ask for more damages than any jury is disposed to give them. By permitting a litigant to increase his request for damages, the trial court does not approve or disapprove the enlarged demand, and we believe from experience that the average jury well understands that fact. However, the *Sanguinetti* case holds to the contrary, and, as an intermediate appellate court, we are, of course, bound by what the Supreme Court directs. We, therefore, hold that the request for leave to amend their demand in the presence of the jury was an error on the part of the defendants, but we do not believe that if it existed alone, it would require a reversal of the judgment in this particular litigation.

▇▇ Appellant objects to the second paragraph of defendants' instruction No. 19, which states: "You must presume that the improvements put upon the land taken will conform to the plans and diagrams here in evidence, and you must, once and for all, fix the damages, present and prospective, that will accrue reasonably from the construction and presence of the improvement, and in this connection *you must consider the most injurious use to which the condemnor may lawfully put the property,* but you must assume that the state will construct and maintain the improvement as proposed by the state." (Italics added.)

Appellant argues that this instruction amounted to an invitation to the jury to base its award of damages on "remote . . . and conjectural elements," and cites *People* v. *Barnes,* 8 Cal.App.2d 185 [47 P.2d 350], as being a case similar to the one at hand because there the improvement by the condemner had also been completed and no further construction remained to be done; in that case, the court refused an instruction as to the "most injurious use" and this ruling was affirmed on appeal. In *People* ex rel. *Dept. of Public Works* v. *Logan,* 198 Cal.App.2d 581, 589 [17 Cal. Rptr. 674], however, this same instruction was given and the appellate court held "Standing alone, or taken with the

instructions as a whole, it does not appear that the instruction . . . contains error. Even assuming error . . . it cannot be said that the error was prejudicial. . . .''

The instruction in its present form has been approved, not only in the case of *People* ex rel. *Dept. of Public Works* v. *Logan, supra,* but in other cases (see: *East Bay Municipal Utility Dist.* v. *Lodi,* 120 Cal.App. 740 [8 P.2d 532]). We do not believe that there was error.

■ Appellant finally objects to a portion of instruction No. 38 requested by the Lundys. The entire instruction follows: ''The law is that comparable sales may be shown, either in direct or cross examination, both for the purpose of establishing market value of property and to reflect on the credibility of an expert witness. However, the witness need not base his opinion entirely on comparable sales. *Any existing facts which enter into the value of the land in the public and general estimation tending to influence the minds of sellers and buyers may be considered.* Hence the fact, if it is a fact, that a witness does not consider a sale which you or another witness might consider comparable as to location, time and physical characteristic, while it might strongly reflect on the weight of credibility of his testimony does not mean that the opinion of said witness shall be completely disregarded, if, considering his entire testimony as to the basis of his belief, you are of the belief that he has taken into consideration other and proper factors as stated in these instructions in arriving at his opinion as to value. To state it in another way, comparable sales, or other sales, are merely one of the factors which an expert witness takes into consideration in arriving at an opinion of fair market value, but it is not necessarily the sole factor.'' (Italics ours.)

It should be noted that the court refers to any facts ''. . . which enter into the value of the land in the public and general estimation. . . .'' We believe this is a correct statement of the law, and we reject the theory advanced by the appellant that the court has told the jury that ''any factor'' may be considered.

For the reasons heretofore given, the judgment is reversed.

Brown (R.M.), J., concurred.

STONE, J., Concurring and Dissenting.—I confine my dissent to the nature of defendants' right of access. I believe defendants owned a compensable property right that was

destroyed when the state closed off the crossing from their land over the railroad right of way to highway 99. Defendants' right of access was not a mere possibility, something that might accrue in the future; it was an existing right, one that had been exercised for some 50 years. The right had passed with the land, each new owner continuing to use the crossing to gain access to highway 99.

The majority stress the fact that the railroad could have terminated defendants' right to cross at any time. But the railroad did not terminate the right, the state condemned it. Furthermore, had the railroad done so, defendants could have petitioned the Public Utilities Commission under Public Utilities Code section 7537 to have a right of access established. I cannot agree with the majority view that since the landowners failed to petition the Public Utilities Commission there was no compensable property right. There was no reason to petition the Public Utilities Commission for a right defendants were already exercising, a right that had been enjoyed by them and their predecessors for 50 years.

It seems to me that the arguments presented by both sides merely raise questions of value. That is, in determining the question of damages the jury could consider (a) that the railroad might cancel defendants' right to cross its property at any time, (b) that defendants could petition the Public Utilities Commission for an access crossing, and (c) that defendants and their predecessors had used the crossing without interference for 50 years.

Weighing possibilities and probabilities in determining value is not at all unusual in condemnation actions. For example, the question of present zoning, the possibility of future zoning changes, and the question of the highest and best use of property, are probabilities that arise in condemnation cases. (*People* v. *Donovan,* 57 Cal.2d 346, 352 [19 Cal.Rptr. 473, 369 P.2d 1] ; *People* v. *Graziadio,* 231 Cal.App. 2d 525, 528 [42 Cal.Rptr. 29].)

A petition for rehearing was denied December 23, 1965, and respondents' petition for a hearing by the Supreme Court was denied January 19, 1966.