[Civ. No. 648. Fifth Dist. Sept. 29, 1966.]

THE PEOPLE EX REL. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. GIUMARRA VINEYARDS CORPORATION, Defendant and Respondent.

310

Harry S. Fenton, Holloway Jones, Jack M. Howard, Lee Tyler, Herman H. Fitzgerald, Richard S. Levenberg and William R. Edgar for Plaintiff and Appellant.

Mack, Bianco & Means and Dominic Bianco for Defendant and Respondent.

CONLEY, P. J.—In compliance with a desire to establish a freeway on part of highway 99 in Kern County, the People of the State of California, acting through the Department of Public Works, brought this suit to condemn property of Giumarra Vineyards Corporation located in its 356.63-acre vineyard, some seven miles north of Bakersfield. The complaint specified two parcels subject to the eminent domain proceeding, one being designated as parcel 10A, a small area near the southeastern corner of the defendant's property to provide a turn-around for a new access road built by appellant, ending near the southeasterly corner of respondent's property; the other, numbered 10B, being "For freeway purposes, the extinguishment of all easements of access in and to the existing State highway road VI Ker 4-D appurtenant. . . ."

The Giumarra vineyard is separated from highway 99 by the Southern Pacific railroad's right of way; the Giumarra easterly property line is its common boundary with the west-

ern property line of the railroad's right of way. The railroad corporation secured its right of way through a Congressional grant in the year 1866.

The easterly boundary of the railroad right of way is the westerly boundary of highway 99. A 60-foot county-road crossing beginning at the westerly boundary of the state highway and extending 221 feet across Southern Pacific's right of way and ending on the northeasterly boundary of Giumarra Vineyards' property afforded Giumarra its only public access to the highway and connecting roads; it was known as the ''Prospero'' crossing. This crossing was conveyed to Kern County by the Southern Pacific Company on November 2, 1950, for the construction of a public highway. Giumarra's buildings are located near the crossing on the westerly side of the railroad.

After receiving a letter from the Division of Highways stating that state highway 99 in that area was going to be made a freeway, and, at the suggestion of the highway division, the board of supervisors passed a resolution declaring its intention to close and abandon the Prospero crossing. The Department of Public Works then applied to the Public Utilities Commission to close the crossing and that body authorized its elimination. Thereupon, plaintiff filed the instant complaint in eminent domain as to parcels 10A and 10B.

Giumarra Vineyards' packing shed was located in close proximity to the abandoned county road and is now 7/10th of a mile from the new access area to the south; the access road runs in a southerly direction from the southern line of the Giumarra property a distance of one and one-half miles to Seventh Standard Road; the point where the access road intersects with Seventh Standard is a mile and a half from the freeway. From the Prospero crossing, which was closed, to the intersection of the freeway and Seventh Standard Road is three miles. Access from the north along highway 99 to Giumarra Vineyards' packing shed has been increased by an additional seven miles. Access from the south to the shed is approximately the same as before.

Giumarra Vineyards remained in the actual possession and had the use of parcel 10B from September 1, 1962, until March 31, 1964.

The pretrial order provided for a preliminary hearing lasting one day to determine whether the defendant had a property right taken by the state through the elimination of the

Prospero crossing; the order on that special issue established that Giumarra had an easement of ingress and egress by virtue of parcel 10B, the extinguishment of which entitled Giumarra to just compensation.

Upon the later trial before the jury, as to damages, the value of parcel 10A with its improvements was found to be $1,070, and the severance damages accruing to the remainder of the property was determined to be $102,620.

The court reserved jurisdiction to enter a later order for the payment of any unpaid real property taxes, penalties or assessments upon the real property which had become a lien in favor of Kern County before September 1, 1962. The court awarded interest at the rate of 7 percent per annum from September 1, 1962, the date upon which taking by the state was authorized. The portion of the trial before the jury relative to damages was extensive; the reporter's transcript contains approximately 925 pages.

The state urges the following points for reversal:

1) The trial court erroneously held that the extinguishment of access by appellant's taking of parcel 10B entitled Giumarra Vineyards to compensation;

2) The court improperly limited appellant's cross-examination of respondent's valuation witness, Beagle;

3) The plaintiff's motion to strike the severance damage testimony of Mr. Kirkorian should have been granted; and

4) The court erred in ruling that appellant was not entitled to offset the value of Giumarra Vineyards' continued possession and use of the Prospero crossing against the interest which appellant was required to pay for obtaining an early order for immediate possession of parcel 10B.

THE GIUMARRA VINEYARDS CORPORATION HAD A
RIGHT TO DAMAGES FOR PARCEL 10B.

 There is no quarrel on the part of appellant with the amount awarded by the jury for the taking of parcel 10A, consisting of .535 of an acre, which the jury found to be worth the sum of $1,070. Bitter complaint, however, is made of the award by the jury of a very substantial sum for the taking of parcel 10B. That the defendant was actually hurt financially is conceded, but the plaintiff contends that no property right was taken by the state and that, therefore, the People of the State of California are not responsible collectively for any harm done to the defendant.

In this connection, the plaintiff suggests that the principle discussed in *People* ex rel. *Dept. of Public Works* v. *Lundy,* 238 Cal.App.2d 354 [47 Cal.Rptr. 694], is controlling. In that case, which, incidentally, related to the same proposed freeway with defendants' land situated physically in much the same relationship with the freeway and the railroad as in the present case, this court reversed a judgment which granted compensation to the landowners for the closing of a means of access from their land to highway 99, based wholly on a license by the railroad without the existence of a deed or of a county road. The *Lundy* opinion correctly said on pages 357-358: "A prerequisite to compensation [in eminent domain] is that a claimant must prove his ownership of an estate or interest in the land being condemned. [Citing cases.] No deed or contract with the railroad company gave any easement to the Lundys; neither did any holding of the Public Utilities Commission. And adverse possession may not be urged as the use of the crossings was not adverse, but by permission, and, in any event, title by adverse possession across an active railroad right of way cannot be acquired by individuals. [Citing authorities.] . . .

"A revocable license is the highest possible legal status characterizing Lundys' ability to cross Southern Pacific's right of way. Such a license creates no property interest. (*Eastman* v. *Piper,* 68 Cal.App. 544, 650 [229 P. 1002].) Licenses, or privileges, which are unenforceable against the fee owner, are not proper subjects of condemnation."

The present case is readily distinguishable from the *Lundy* case, *supra*; in the instant suit, the county road across the railroad right of way utilized a crossing which had been conveyed to Kern County by the Southern Pacific on November 20, 1950, and as a consequence the owners of the presently considered land did obtain a property right for which the state had to pay if it condemned.

In *People* ex rel. *Dept. of Public Works* v. *Logan,* 198 Cal.App.2d 581, 586-587 [17 Cal.Rptr. 674], this court discussed the value of the taking of an easement, and said: "A long line of cases has held that a property owner abutting upon a public street or highway has a property right in the nature of an easement of ingress and egress to and from his property, and that right cannot be taken from him without just compensation (*Rose* v. *State of California,* 19 Cal.2d 713 [123 P.2d 505]; *Bacich* v. *Board of Control,* 23 Cal.2d 343

[144 P.2d 818]). The taking of an easement of access to public highways is compensable measured in terms of severance damages, that is, in terms of the diminution in the value of the property which formerly had the easement of access. (*Rose* v. *State of California, supra; Anderson* v. *State of California,* 61 Cal.App.2d 140 [142 P.2d 88]; *People* v. *Al G. Smith Co., Ltd.,* 86 Cal.App.2d 308 [194 P.2d 750].)

"In the instant case the easement must be considered to be appurtenant to the property in that it provided the only means of access thereto. The defendants could not have used that strip for any purpose inconsistent with the right of other property owners to use it as a means of access to the highway. The damage for taking an easement appurtenant is measured by the injury to the land to which it is appurtenant (*Olson* v. *United States,* 67 F.2d 24). . . .

"Obviously, the easement added to the value not only of the land actually taken but to the value of the land the title to which remained in defendants. Both the land actually taken and the remaining land were damaged by the taking of the easement, and an element therefor could properly be included in the award for severance damages as well as in the award of damages for the property taken."

There is no question but that a railroad has the power to convey a part of its right of way for public purposes. (43 U.S.C.A. § 913.) ▆▆▆ The county accepted the road; it became a public highway; defendant's rights as an abutting owner attached.

▆▆▆ An abutting owner has a public right in common with all other citizens, and private rights which arise from "ownership of property contiguous to the highway" whether he owns the fee of the road or not. (*Lane* v. *San Diego Elec. Ry. Co.,* 208 Cal. 29, 33 [280 P. 109].)

▆▆▆ Defendant's property abutted on the public road, which was the only access to the highway system and adjoining roads. Without it, the defendant's acreage had no opening onto a public road; a substantial damage was suffered.

▆▆▆ In *Breidert* v. *Southern Pac. Co.,* 61 Cal.2d 659, 663-664 [39 Cal.Rptr. 903, 394 P.2d 719], the court, in an opinion written by Mr. Justice Tobriner, stated: "The principal issue of the case resolves into whether the closing of the Vaughn Street crossing so impaired plaintiffs' right of access in that street as to constitute a taking or damaging of property entitling them to compensation. Plaintiffs' claim rests upon the

provision of the California Constitution that private property may not be taken or damaged for public use without just compensation (Cal.Const., art. I, § 14). Plaintiffs thus purport to state a cause of action in inverse condemnation.

"We have long recognized that the urban landowner enjoys property rights, additional to those which he exercises as a member of the public, in the street upon which his land abuts. Chief among these is an easement of access in such street. [Citations.] This easement consists of the right to get into the street upon which the landowner's property abuts and from there, in a reasonable manner, to the general system of public streets. [Citations.]

"To designate the right, however, is not to delineate its precise scope. Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation. Such compensation must rest upon the property owner's showing of a *substantial impairment* of his right of access to the general system of public streets.

"The determination of whether such substantial impairment has been established must be reached as a matter of law. The extent of such impairment must be fixed as a matter of fact."

■ In *Valenta* v. *County of Los Angeles*, 61 Cal.2d 669, 671 [39 Cal.Rptr. 909, 394 P.2d 725], Justice Tobriner again wrote the opinion, stating: "Thus we deal with claimed damage resulting from the creation of a cul-de-sac; the principle expressed in *Breidert* v. *Southern Pac. Co.* (1964) *ante*, p. 659 [39 Cal.Rptr. 903, 394 P.2d 719], as to such a situation must apply. Although defendants argue that 'the cul-de-sac rule cannot properly be applied to a rural highway,' any distinction between unincorporated rural areas and incorporated city areas would be purely formal.

"To grant recovery to owners of property in an incorporated area and to deny it to those in an unincorporated area would be to draw an indefensible division. No reasonable or functional line distinguishes such property holders. The unincorporated area often becomes the incorporated area; the sprawling growth of city and subdivision necessarily blurs any such classification. Indeed, the cases recognize that the owners of land in unincorporated areas possess property rights identical to those of urban landowners. [Citations.]

"In *Tift County* v. *Smith* (1962) 107 Ga.App. 140 [129 S.E.2d 172] (reversed on other grounds (1963) 219 Ga. 68 [131 S.E.2d 527]), the Georgia Court of Appeals held, on facts substantially identical to those of the instant case, that rural property owners had the same rights in abutting streets as did city property owners, and that plaintiff was entitled to compensation for loss of access. The court stated that 'The defendant seeks to draw a distinction between rural property and urban property when, while the value per front foot may vary, there is no distinction in the rights in the owners of such property. The provisions of the Constitution that the protection of person and property shall be impartial and complete [citations], and that private property shall not be taken or *damaged* without just compensation being first paid [citations] do not allow one rule for urban property owners and another for owners of rural property.' (*Id.* at p. 174 [129 S.E.2d].)

"Defendants rely upon dicta in two older cases which we disapprove. In *Levee Dist. No. 9* v. *Farmer* (1894) 101 Cal. 178 [35 P. 569, 23 L.R.A. 388], and *Swift* v. *Board of Supervisors* (1911) 16 Cal.App. 72 [166 P. 317], the respective plaintiffs unsuccessfully sought injunctive relief against county boards in order to prevent proposed abandonments of county roads. Holding that the involved board possessed the power to order such abandonment, each of these courts included in its opinion dicta to the effect that an abutting owner cannot recover damages for loss of access to a county, as distinguished from a city thoroughfare. *Metzger* v. *Bose* (1960) 183 Cal.App.2d 13 [6 Cal.Rptr. 337], relies upon the same proposition. As we have stated, we do not agree, and to that extent we disapprove of those cases."

Appellant argues that because the police power of the state is involved here, no rights subject to condemnation were secured by the defendant through the railroad's deed to the County of Kern and the construction and maintenance of the county road. We cannot accept this argument, for we see no essential difference between the right of access secured by the defendant by reason of a public road based upon a deed issued voluntarily by the railroad company and the right of access existing in any other public road. It is true, of course, that the defendant could not ordinarily block the carrying out of the public policy of the Department of Public Works, the

Public Utilities Commission and the County of Kern in deciding to close the highway, but this is not equivalent to saying that the individuals along a public highway, which has been formally constituted, have no right of access which the state must condemn if it wishes to close the public road. ▮ We hold that the court below was correct in determining as a matter preliminary to the finding of damages that the Giumarra Vineyards Corporation had a substantial right which was being taken away by the state and for which adequate compensation was constitutionally due. (Cal.Const., art I, § 14.)

WHILE THE CROSS-EXAMINATION OF THE WITNESS BEAGLE WAS ERRONEOUSLY LIMITED, SUCH ERRORS WOULD NOT JUSTIFY A REVERSAL IN VIEW OF THE WHOLE RECORD.

▮ James C. Beagle was a valuation witness called by the defendant. Appellant complains of rulings of the trial court limiting, in certain respects, his cross-examination. He testified that, in his opinion, the packing shed of the defendant had a value of $70,000. The state, on cross-examination, asked him with reference to an alleged recent purchase by one Gagosian of a packing shed in the vicinity for the sum of $50,000. Upon objection of defendant's counsel, the court refused to permit the question on the ground that it had not been first proven that the Gagosian shed was comparable. The purpose of the cross-examination was said by the state's attorneys to be for impeachment purposes.

In our opinion, the court was entirely too restrictive in its ruling. Certainly there was enough indication of gross comparability between the sales to warrant the searching questions asked by the state on cross-examination. If the witness had been queried about the sale of a high-rise building in New York or a hut in Alaska, the ruling would have been proper, but the question dealt with a grape packing shed in the area, and if it differed from the valuation of the Giumarra shed in the mind of the witness, he could have said why. It would appear that the court was unduly influenced by the general rule with respect to direct examination of an expert valuation witness that he should use only comparable sales; but this was cross-examination and the question should have been permitted.

Much of the same comment may be applied to the court's ruling that the state should have refrained from asking this

valuation witness whether he knew the source of the grapes customarily processed in the packing house, that is to say, from what direction they came. The question was within the general scope of cross-examination in order to test the knowledge and viewpoint of this expert witness; it should have been allowed.

While we think the court erred in the two specified rulings, it appears to us that such errors could not possibly justify a reversal in view of article VI, section 4½ of the Constitution. Cross-examination of this witness occupied approximately 175 pages of the reporter's transcript, and we suggest that the qualifications and knowledge of Mr. Beagle were sufficiently exposed so that there was nothing basically unfair in the treatment of his testimony by court or counsel.

### THE KIRKORIAN TESTIMONY WAS NOT IMPROPER.

It is urged that defendant's witness Kirkorian based his testimony wholly and directly on loss of business. ■ Of course, it is elementary that damages in a trial of this kind depend on the reasonable market value of the property taken by the state. Damages are not awarded directly for loss of business. (*People* v. *Ayon*, 54 Cal.2d 217, 226 [5 Cal.Rptr. 151, 352 P.2d 519]; *Breidert* v. *Southern Pac. Co.*, *supra*, 61 Cal.2d 659, 667; *People* v. *Ricciardi*, 23 Cal.2d 390, 396 [144 P.2d 799].) ■ And it is true that when cross-examination shows that testimony with respect to severance damages is based wholly upon noncompensable items a motion to strike such testimony should be granted. (*Sacramento etc. Drainage Dist.* ex rel. *State Reclamation Board* v. *Reed*, 215 Cal.App. 2d 60, 64 [29 Cal.Rptr. 847].)

· ■ Mr. Kirkorian stated that if he were to buy this property he would discount $100,000 from the deal, and, when asked how he reached that figure, he stated, "Well, I just don't like the location of the packing house and have to do business that way. I think I would lose a lot of business, I really do. I would lose a lot of business by a buyer driving all the way from Fresno going round in a circle and trying to get in and saying: 'Well, I'll go to Arvin first and come back on my way.' By the time he comes back, he may have all his quota bought up for the day and I think I would lose a lot of business that way." And then he was asked, "And the hundred thousand dollars is based on that? That you lost

business?" And he answered, "Oh, yes." At that time, Mr. Fitzgerald moved to strike the testimony on the ground that it was predicated completely on noncompensable items.

Kirkorian had testified on direct examination that in the "before" condition he valued the vineyard, including the shed, at approximately $750,000, but in the "after" condition, because of the elimination of access, he would reduce the fair market value of the property by 15 to 20 percent; he emphasized that the accessibility of the shed to fruit buyers was an important consideration in the grape business. Mr. Kirkorian himself owned a 500-acre vineyard, and he had his plant built "right on the road," so it would be easily accessible to buyers. Before the witness stated that he would "lose a lot of business," he said: "Well, I just don't like the location of the packing house and have to do business that way." Respondent maintains, and it would seem properly so, that the witness was considering accessibility to the property for the purpose of conducting the business for which it was adaptable, and as to which it became less valuable through the taking of parcel 10B; in other words, Mr. Kirkorian was not considering the "loss of business" as direct damages for which the owner was entitled to recover a specific sum of money, but only as reflecting on the market value of the vineyard before and after the taking. All of the valuation witnesses expressed the opinion that the highest and best use of the property was as a fresh grape vineyard and packing shed. The after condition of the property would show to any experienced grape man a loss in the depreciated value of the property, because the loss of access made the packing shed and the surrounding vineyard less valuable. A buyer would want to know what the effect of the elimination of access had on the property from a customer's standpoint, not to recover damages directly for "loss of business" but to show the loss of market value of the property when shut off from direct access to the state highway system.

In proper perspective, this only meant that, in his opinion, the market value of the land would be $100,000 less by reason of the fact that the packing shed would be rendered largely useless by the loss of access to highway 99 by the county road. The instructions given by the court to the jury with respect to damages were correct in form and substance, and it may be assumed that the jury properly followed the rule laid down by the court for assessing damages.

APPELLANT IS ENTITLED TO AN OFFSET BY REASON OF
THE FACT THAT ACTUAL POSSESSION OF PARCEL 10B
CONTINUED IN RESPONDENT FOR MONTHS AFTER THE
RIGHT OF TAKING BY THE STATE WAS ORIGINALLY
ESTABLISHED.

The final argument made by appellant is that the judgment is erroneous because, while the defendant concededly had actual possession of parcel 10B from September 1, 1962, when the preliminary order giving the state the right to physical possession of the parcel took effect, until March 31, 1964, when the state did in fact close the crossing, no allowance of offset is incorporated in the judgment. The record indicates that the defendant continued to use parcel 10B during all of that time.

At the hearing as to whether plaintiff was entitled to a setoff under Code of Civil Procedure, section 1255b, George Olsen testified that, in his opinion, the value of possession of parcel 10B for that period of time was $11,495. On cross-examination, it became clear that Olsen had inadvertently used the total verdict figure of $103,690 instead of the severance damage figure of $102,620 to arrive at his conclusion and that, under his theory, the amount should have been something less than $11,495. Olsen testified that parcel 10B did not produce rents, issues or profits.

Appellant urges that the access right should be valued for this purpose by the amount of severance damages to the property to which it provided access (*People* ex rel. *Dept. of Public Works* v. *Logan, supra,* 198 Cal.App.2d 581, 586), and that the court's finding that the value of possession was nil was erroneous, because Olsen gave the only testimony concerning the *value of possession* for this period. Appellant urges that it is inconsistent and illogical for respondent to say at the trial that parcel 10B was highly valuable for the purpose of determining severance damages, but that it had no value at all for ascertaining an offset under the Code of Civil Procedure, section 1255b. That section provides in part: "If after the date that interest begins to accrue the defendant continues in actual possession of or receives rents, issues and profits from the property, the *value of such possession* and of such rents, issues and profits shall be offset against the interest that accrues during the period the defendant continues in actual possession or receives such rents, issues or profits." (Italics added.)

It is our view that the court rather than the jury should determine the amount of this offset inasmuch as it is charged with considering and awarding the interest to be allowed for an early taking. Although $102,620 was awarded by the jury for the taking of parcel 10B, together with interest from the date of early taking, it is obviously anomalous not to deduct some counter money value for the enjoyment by the defendant of the full exercise of the rights described in parcel 10B for all of the many months indicated by the record.

The burden of proof is upon the plaintiff to establish the amount of this offsetting item during the time that the defendant enjoyed the full use of parcel 10B after the state, by court order, had secured the right of immediate possession until the date when it took actual possession. The value of said possession during said time is factual and dependent upon evidence as to the money value to defendant of the full use of parcel 10B during that period in connection with its ownership of the vineyard, but in accordance with good conscience and common sense, as well as by the explicit provision of the statute specifying said deduction as an *offset*, it should not in any event exceed legal interest for the period involved at the rate of 7 percent per annum on the established amount of severance damages. (See *People* ex rel. *Dept. of Public Works* v. *Logan, supra,* 198 Cal.App.2d 581, 586-587 [17 Cal.Rptr. 674].)

Incidentally, the California Law Revision Commission has recently considered these questions, and in a preliminary report it has reached the same conclusion that we endorse here, namely, that the trial court should ascertain the amount of the offset and make a finding accordingly. In the tentative recommendation of the commission[1] at page 6, it is said: ''Subdivision (b) of Code of Civil Procedure Section 1255b provides that if the defendant 'continues in actual possession of or receives rents, issues, and profits from the property' after interest begins to accrue, the 'value of such possession and of such rents, issues, and profits' are to be offset against the interest. The section should be amended, in the interest of clarity, to provide that it is the value of possession and the net amount of rents or other income that are to be offset.

''Before 1959, case law permitted the defendant to show

---

[1]Tentative Recommendation relating to Condemnation Law and Procedure, Number 5—Possession Prior to Final Judgment and Related Problems, Revised September 15, 1966, California Law Revision Commission, School of Law, Stanford University.

that a higher rate of return than the legal rate of interest was required to give him fair compensation for the loss of possession prior to judgment. In 1959 the Legislature provided, in the interest of simplicity, that such compensation should be computed in all cases as 7% per annum upon the award. In 1961, the provisions of interest were amended to permit the value of the condemnee's use and occupancy to be set off against the accruing interest. Since 1961 it has been uncertain whether interest, and the offset against interest, are to be determined by the court or by the jury. Apart from the tendency of such issues to confuse the jury, determination by jury requires each of the parties to present evidence inconsistent with the position taken upon trial of the main issue of compensation. For example, if a capitalization-of-income approach is taken to value, the property owner seeks to show a maximum value of such income. However, in attempting to show a minimum offset of rentals against interest, he must show a minimum rental value. The Commission therefore recommends that Section 1255b be clarified to provide that the court shall determine the amount of the interest in all cases, including interest constitutionally required as compensation for possession prior to payment. The section also should provide that the amount of any offset against interest should be determined by the court, and that evidence on that issue should be presented to the court, rather than to the jury.''

It is ordered that the trial court consider the question of offset to the interest awarded in the case from the date of granting immediate possession and amend the findings and judgment accordingly so as to reduce the total damages set forth therein by the amount found by the court to be the value of the exercise of the rights described as parcel 10B from September 1, 1962, to March 31, 1964; the trial court, if it deems it desirable, may permit the respective parties to offer additional evidence relative to this issue. The judgment as so amended is affirmed. Respondent shall recover costs of the appeal.

McMurray, J. pro tem.,* concurred.

A petition for a rehearing was denied October 20, 1966, and the opinion and judgment were modified to read as printed above.

*Assigned by the Chairman of the Judicial Council.