[Civ. No. 22770. First Dist., Div. One. Feb. 27, 1967.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. MICHAEL Dɪ TOMASO et al., Defendants and Respondents.

742

Harry S. Fenton, Holloway Jones, Jack M. Howard, Lee Tyler and William R. Edgar for Plaintiff and Appellant.

Marlais & Hover and Wade H. Hover for Defendants and Respondents.

SIMS, J.—The state, as condemnor, has appealed from a judgment which awarded the defendant property owners $55,000. This judgment ensued from a jury trial which resulted in a verdict that the fair market value of the property taken was $35,000, that the owners suffered $20,000 damages to the remainder of their property by reason of the severance and the construction of the improvement in the manner proposed, and that there were no special benefits accruing to the remainder of the property by reason of such construction.

The gravamen of the condemnor's complaint is that the owners, despite objections thereto, were permitted to exploit unwarrantedly an alleged loss of promised access to the property, and that the errors in this regard resulted in excessive damages. The People further assert that error was committed in permitting one of the owners to testify in regard to the amount he was paying for substituted rental property.

An examination of the entire record fails to reflect any prejudicial error in the rulings of the trial court with respect to the matters of which complaint is made and the judgment should be affirmed.

*The Facts*

The property in question is located south of the city limits of the City of San Jose near the gore formed by the intersection of Monterey Road, the principal artery from San Jose south to Gilroy, and the Bayshore Freeway, which at that point rejoins the former highway after by-passing the city. The property, prior to 1958, had a frontage of approximately 390 feet along the northerly side of Monterey Road. It extended and extends northerly in the form of a boomerang, with a bend westerly. Subject to some irregularities in the perimeter, the southerly portion, abutting on Monterey Road, was roughly of a uniform width of 390 feet and extended northerly approximately 1,340 feet on its long, or easterly,

side, and about 975 feet on the westerly side. The northerly portion was and is approximately 410 feet in width and had commensurate side dimensions of about 975 feet on the east, and 995 feet on the west.

Up until the time the condemnor took possession in the present proceedings the property was improved by a house and garage and other appurtenant structures. It was planted to orchard and used for agricultural purposes.

Cottle Road, a county highway, intersects Monterey Road from the south. A projection of the center line of Cottle Road, as it was realigned in 1958, would intersect the subject property at a point about three-quarters of its width as measured from west to east. Prior to 1958 the owners' 10-foot wide driveway entered the northerly side of Monterey Road at a point approximately opposite the corner formed by the intersection of the easterly side of the realigned Cottle Road and the southerly side of Monterey Road.

In that year, in connection with the improvement of Monterey Road and Cottle Road, plans were made to channel the traffic in and out of Cottle Road on the south side of Monterey Road, and to control the intersection with signal lights. The State Department of Public Works secured a "Permit to Enter"[1] from the property owners so that it could place on their property a triangular base and traffic signal opposite the westerly side of Cottle Road, and a concrete curved curb opposite the easterly side of Cottle Road. The curb was to be erected over the site of the existing driveway. In return the state agreed to realign approximately 100 feet of the property owners' driveway so that it would enter Monterey Road between the triangular signal base and the new curb. The driveway was designed to fan out to the complete width of almost 50 feet between the foregoing structures as it met the shoulder of the highway. All of this planned work was completed.

To meet the needs of further development, plans were made to widen Monterey Road and to construct a new connecting road from the intersection of Monterey Road and Cottle Road

---

[1] This permit read: "Permission is hereby granted the State, or its authorized agent, to enter upon our land as outlined on the map attached hereto and made a part hereof for the purpose of constructing a road approach as shown on the attached sketch.

"This permission is granted in consideration of the location, improvement and construction of State highway and incidents thereto, which it is understood is required by the State of California, Department of Public Works, Division of Highways."

to the area which lies northeast of the intersection of Bay-shore Freeway and Monterey Road and is served by Ford Road. This road would also accommodate traffic southbound on Bayshore Freeway which leaves that highway to go wester-ly on Monterey Road. The connecting road was planned to take off northerly from Monterey Road directly opposite the Cottle Road intersection and immediately curve to the east. For the widening and for the construction of this road, as originally planned, it was necessary to acquire .908 of an acre of the DiTomasos' property.

On February 9, 1960, while a condemnation action was pending, the owners entered into a right-of-way contract with the Department of Public Works and executed a deed to the state. The property taken may be visualized by carving away approximately 72½ feet in depth from the original rectangle with a frontage of 390 feet on Monterey Road, and augment-ing it by a curved bite into the southeasterly corner of the remainder, which left that corner an additional 97 feet back from the new frontage line of Monterey Road. The taking replaced the easterly 170 feet of frontage on Monterey Road with the curve of the bite, which presumably would front on the proposed connecting road. Approximately 220 feet were thus left along the northerly side of the original highway as widened. This take embraced the highway improvements which had been placed on the owners' property pursuant to the 1958 permit.

Under the terms of the negotiated right-of-way contract[2] the state agreed to pay $11,500, and escrow and recording

---

[2]So far as is material the agreement recites:

"In consideration of [the execution and delivery of a deed to the property], and the other considerations hereinafter set forth, it is mu-tually agreed as follows:

"1. The parties have herein set forth the whole of their agreement. The performance of this agreement constitutes the entire consideration for said document and shall relieve the State of all further obligation or claims on this account, or on account of the location, grade or construc-tion of the proposed public improvement.

"2. The State shall:

"(A) Pay the undersigned grantor(s) the sum of $11,500.00 . . .

"(B) Pay all escrow and recording fees . . .

"(C) At no expense to the grantors and at the time of construc-tion, construct a road approach left of Engineer's Station 388+70+, Department of Public Works Survey between Cottle Road and Ford Road, the final location to be determined by the grantors and the State's resident engineer. It is understood and agreed that upon comple-tion of work of construction of the road approach above mentioned, said road approach shall be considered as an encroachment under permit upon the State highway and is to be maintained, repaired and operated as

fees, and to construct a "road approach" to the left of a point which was approximately coincidental with a northerly projection of the center line of Cottle Road. The clause concerning the last undertaking is the principal source of the issues raised on this appeal insofar as it affects the value of the property in its condition before the current take.

Thereafter, because of increased traffic potential in the area, the plans for the connecting road were revised and it became necessary to acquire additional land for its construction. Authorization was secured for the acquisition of an additional .684 acres of the DiTomaso property. The present action was filed and summons was issued May 2, 1963. The property, the subject of this taking, can be visualized as an additional bite out of the southeast corner of the property which moved that corner northerly an additional 267 feet and reduced the frontage along Monterey Road from 220 to about 173 feet. The curved frontage on the right of way for the proposed access road was increased from about 209 to about 425 feet. This take included the residence, garage, sheds, other outbuildings, well and pump house, apricot and prune drying yard and related facilities used in the operation of the orchard on the 19.029 acres which had remained after the 1960 acquisition.

According to the state, the plans at the time of the 1960 acquisition contemplated widening Monterey Road to a divided highway with two lanes of traffic in each direction. The connection from Cottle Road to Ford Road, which left the northerly boundary of Monterey Road opposite the intersection of Cottle Road and immediately curved within the 1960 "bite" in an easterly direction, was projected with one lane in each direction.

At the trial, the owners produced a plan which had been furnished through discovery proceedings taken to ascertain the extent of the improvements contemplated in 1960. It indicated only one four-lane roadway for Monterey Road at the

---

such by grantors, in accordance with and subject to the laws of the State of California and the rules and regulations of the Division of Highways, Department of Public Works of said State.''

''3. Permission is hereby granted for the State, or its authorized agent, to enter upon the grantors' remaining property, when necessary, for the purpose of constructing and/or connecting said road and placing curbs where necessary.

''. . . . . . . . . . . .

''8. It is understood and agreed that through this acquisition of land for State highway purposes the Highway Department will not fence the right of way across the front of the owner's remaining property.''

intersection with Cottle Road and the Cottle-Ford connecting road, and had different details for the intersection, including what appeared to be the inclusion of the signal base and curb constructed in 1958.

The state contended that the latter design was furnished in error, and produced a subsequently discovered plan supporting the divided highway projection. This plan was apparently prepared, however, prior to the relocation of Cottle Road and the 1958 improvement of the intersection as the same were indicated on 1958 "As Built" plans, on the design furnished to the owners two weeks before the trial, and on the "Existing Topography" of the plans approved in October 1962 upon which the instant acquisition was predicated.

The evidence for the condemnor indicated that the plans upon which the 1963 condemnation is based contemplated the ultimate development of a four-lane divided highway, with a median strip dividing the eastbound and westbound lanes, between Cottle Road and Ford Road. The grade of the highway would be from .5 of a foot to 2.5 feet above the grade of the owners' property as the road runs easterly on the curve in the new "bite." On that curve there would be two through lanes to Cottle Road, a storage lane for traffic desiring to make a left-hand turn to go easterly on Monterey Road, and separation of the traffic making right turns on Monterey Road from the through traffic going south on Cottle Road. In front of the property. Monterey Road would be divided by a median strip and the highway would be widened to permit traffic turning right from the connecting road to merge with the traffic on Monterey Road.

The state adduced expert testimony to demonstrate that in the "before" condition, and a fortiori in the "after" condition, it would be practically impossible to control traffic coming out of any road from the subject property in the area of the proposed intersection which itself would include the approach road area designated in the 1960 contract. The same witness acknowledged that a driveway could be permitted in the "before" condition if it did not get any traffic volume.

The record reflects that the foregoing ultimate construction would not be completed for six years from the time of trial, or until 1970. It was contemplated that in the interim the right of way for the connecting road would be improved by a two-lane road terminating in a cul-de-sac about 650 or 700 feet easterly of the subject property.

All of the appraisers agreed that the highest and best use of the property was for commercial use in that portion of the property lying adjacent to the existing and projected roads, for single residential use in the extreme north portion where it was bounded by property so zoned, and for multiple residential use over the balance, which constituted almost 75 percent of the property. All acknowledged that the requisite zoning could be secured from either county or city planning authorities.

This unanimity of opinion similarly pervaded the experts' opinions of the value of the residue of the property after the taking.[3] The vast discrepancies appear in the testimony concerning the value of the property before the take and in the resulting damages.[4]

The disparity in the precondemnation values stem from a difference in the assumptions made by the respective appraisers. Those for the property owners assumed that the owners would have been able to improve the property with a public access road from Monterey Road before the 1963 "bite." Those for the state assumed that the 1960 "bite" precluded all possibility of such development. As a result the owners' appraisers gave higher values for the property taken and for severance damages on the theory that in the "before" condition there would have been a public street through the property and two corners adaptable and valuable for service station use; and that in the "after" condition the street and such use, if extant at all, would be curtailed. Thus the trail leads back to the 1960 transaction and its effect on the use and development of the property.

Additional facts bearing on this question and the related points raised by the state are referred to below.

*The Issues*

Condemnor contends that the trial court erred in ruling that there was any legally cognizable impairment of the own-

[3]These figures, with a spread of less than 10 percent from the mean, were $274,700 and $311,800 for the property owners and $279,600 (including special benefits of $9,000) and $307,000 (including special benefits of $19,000) for the state.

[4]These figures were for the property owners: $393,500 ($118,800 damages, consisting of $51,800 for the take and $67,000 severance damages), and $428,000 ($116,200 damages, consisting of $63,575 for the take and $52,625 severance damages); and for the state: $291,500 ($21,000 for the take, no severance, and $9,000 special benefits) and $313,100 ($25,100 for the take, no severance, and $19,000 special benefits). The property owners testified their total damages were $75,000.

ers' right of access. More particularly, it urges that the trial court erred (1) in failing to strike the owners' witness' testimony of value which was predicated upon loss of access, (2) in instructing the jury that access was "somewhat impaired," (3) in permitting the owners to exhibit maps of potential development of the property predicated upon a nonexistent right to connect a public road, and (4) in allowing one of the owners' witnesses to testify as to the existence of a state study indicating such a road.

The state avers that the owners' right of access is the same after the current condemnation as it was before. In fact its witnesses predicate special benefits upon the existence of a greater frontage along the highways. The foregoing contentions all relate to the questions of whether the owners acquired any extraordinary right to access by the 1960 agreement, and if so, the extent of that right. Other alleged errors will be hereinafter discussed.

*The 1960 "Road Approach"*

By the terms of the 1960 agreement (fn. 2, *supra*) the state agreed to construct a "road approach." It first attempts to oversimplify matters by asserting that the road approach was only for the driveway to the improvements on the property and that because the state has now acquired the improvements there is no need for the road approach in any event. This analysis completely overlooks the fact that the road approach, even if of limited scope, would serve not only the domestic needs of the owners but also the orchard which lay around and behind their house.

The agreement (fn. 2, *supra*) recites, "said road approach shall be considered as an encroachment under permit upon the State highway and is to be maintained, repaired and operated as such by grantors, in accordance with and subject to the laws of the State of California and the rules and regulations of the Division of Highways, Department of Public Works of said State."

"It is the general rule that a permit granting an encroachment constitutes a mere revocable license which may be withdrawn at will. (*Rowe* v. *City of Cincinnati*, 26 Ohio App. 87 [159 N.E. 365]; 25 Am.Jur., Highways, § 179; 25 Cal.Jur.2d, Highways and Streets, § 199.)" (*County of El Dorado* v. *Al Tahoe Investment Co.* (1959) 175 Cal.App.2d 407, 411 [346 P.2d 205]; and see Sts. & Hy. Code, §§ 660-695 and 720-724, particularly §§ 670, 673 and 722; and *People* v. *Henderson*

(1948) 85 Cal.App.2d 653, 657 [194 P.2d 91] ; and cf. *People ex rel. Department of Public Works* v. *Lundy* (1965) 238 Cal.App.2d 354, 357-358 [47 Cal.Rptr. 694] ; and *Eastman* v. *Piper* (1924) 68 Cal.App. 554, 560 [229 P. 1002].) "Licenses, or privileges, which are unenforceable against the fee owner, are not proper subjects of condemnation." (*People* ex rel. *Department of Public Works* v. *Lundy, supra,* 238 Cal.App.2d 354, 358; and see *Brick* v. *Cazaux* (1937) 9 Cal.2d 549, 555 [71 P.2d 588] ; and *East Bay Mun. Utility Dist.* v. *Kieffer* (1929) 99 Cal.App. 240, 246 [278 P. 476, 279 P. 178].)

Application of the foregoing principles, as urged by appellant, must be tempered by consideration of the circumstances under which the contract was made. At all times material to this action, and through the two changes in the boundary of their frontage, the owners have enjoyed and still enjoy the legal right to access which the law confers.[5]

" [T]he urban landowner enjoys property rights, additional to those which he exercises as a member of the public, in the street upon which his land abuts. Chief among these is an easement of access in such street. [Citations.] This easement consists of the right to get into the street upon which the landowner's property abuts and from there, in a reasonable manner, to the general system of public streets. [Citations.]" (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 [39 Cal.Rptr. 903, 394 P.2d 719].) "[T]he owners of land in unincorporated areas possess property rights identical to those of urban landowners. [Citations.]" (*Valenta* v. *County of Los Angeles* (1964) 61 Cal.2d 669, 671 [39 Cal.Rptr. 909, 394 P.2d 725].)

The general right of access, as so defined, is subject to the principle that "the state, its subdivisions and municipalities, exercising governmental powers, may limit or regulate access to streets and highways, but such regulation may not go so far

---

[5]The current resolution authorizing the condemnation of subject property refers to a freeway (owners' allusion thereto is a point of alleged error hereinafter discussed), and authorizes the condemnation of abutters' rights of access in connection with other properties. There is nothing in the resolution (see *People* v. *Reed* (1934) 139 Cal.App. 258, 263 [33 P.2d 879]), or the complaint (see *People* v. *Milton* (1939) 35 Cal. App.2d 549, 553 [96 P.2d 159]), to authorize a taking of the owners' ordinary abutter's rights or authorize compensation for them in these proceedings. (See Sts. & Hy. Code, §§ 100.3 and 104.) The owners requested and secured amendments to the findings of fact and conclusions of law which expressly recite that no access rights of the defendants as abutting property owners are proposed to be, or have been, taken or condemned to public use by the current action.

as to destroy the property right. [Citations.]'' (*Stevenson* v. *City of Downey* (1962) 205 Cal.App.2d 585, 590 [23 Cal.Rptr. 127].) ''[A]n owner is not entitled, as against the public, to access to his land at all points in the boundary between it and the highway, although entire access cannot be cut off.'' (*Genazzi* v. *County of Marin* (1928) 88 Cal.App. 545, 547 [263 P. 825].) It has been further stated: ''It is well established that the state may regulate or control such entries if they should prove to be unsafe, and that the police power may even extend to the limitation of a property right if the interest of the general public warrants such action. (*Holman* v. *State*, 97 Cal.App.2d 237 [217 P.2d 448]; *People* v. *Sayig*, 101 Cal.App.2d 890 [226 P.2d 702]; *Holloway* v. *Purcell*, 35 Cal. 2d 220 [217 P.2d 665].)'' (*People* ex rel. *Department of Public Works* v. *Murray* (1959) 172 Cal.App.2d 219, 225 [342 P.2d 485].)

It is obvious that in 1960 the parties intended to change these normal rights and obligations in some way. Clause ''8'' of the right of way contract (fn. 2, *supra*) recognizes the retention of the ordinary abutter's rights. Clause ''2,'' paragraph ''C'' would be unnecessary unless the owners were bargaining for something in addition. The state agreed to construct a ''road approach.'' After the construction it was to be ''maintained, repaired and operated'' as an encroachment under permit, but was it to be revocable at the state's will? The owners testified that they settled the pending 1960 condemnation with the intention of receiving permission to establish the road for access to their property. There is some evidence to show that the price paid was the fair market value of the .908 of an acre which was then conveyed without any allowance for severance damages.

Each side finds some precedent in the 1958 transaction. The sketch attached to the 1958 permit (there is some question as to whether it was attached at the time of execution) indicates that the work to be done included the relocation of an ''Existing Gravel Drive.'' The state contends, therefore, that the words ''road approach'' merely refer to a driveway. The owners, on the other hand, assert that the ''road approach'' refers to the 50 feet delimited between the signal base and the curved curb, and that the agreement established, directly opposite Cottle Road, an approach for a road from the property to Monterey Road.

The state contends that the 1960 clause merely provides for

a second relocation of the driveway if and when the 1960 improvements were actually made, and for the maintenance on the right of way, subject to revocation, of such connecting roadway as would be necessary to connect the property with the actual highway roadway. In other words, the "road approach" is an approach to Monterey Road from a driveway. This interpretation is inconsistent with paragraph "3," which refers to construction or connection of a "road" on owners' property, and also fails to meet the owners' interpretation of the 1958 permit.

The scope of the right created by the 1960 agreement, or, as it may be phrased conversely, the extent of the burden undertaken by the state, will be hereinafter discussed. It is necessary to first determine whether such rights as were created were revocable at the will of the state.

In *County of El Dorado* v. *Al Tahoe Investment Co., supra,* the court recognized: "This rule [of revocation] is subject to an estoppel *in pais* where justice and right require in exceptional cases that an estoppel be invoked. (*Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309, 328 [44 P.2d 547].)" (175 Cal.App.2d at p. 411; and in addition to the case cited, see *McGee* v. *City of Los Angeles* (1936) 6 Cal.2d 390, 394 [57 P.2d 925]; and *Hilltop Properties Inc.* v. *State of California* (1965) 233 Cal.App.2d 349, 364-369 [43 Cal.Rptr. 605].)

This case is singularly like *People* ex rel. *Department of Public Works* v. *Silveira* (1965) 236 Cal.App.2d 604 [46 Cal. Rptr. 260]. In that case access from the condemnees' land to the highway had been previously acquired by the state at all points except four designated openings, three of 20 feet each, and one 40 feet wide. The question posed is stated as follows: "Was the adaptability of defendants' lands in their *before* condition for subdivision purposes in the manner assumed by defendants' valuation witnesses speculative because it depended upon the obtaining of the consent of the California Highway Commission to any connection of a public street or road with the freeway?" (236 Cal.App.2d at p. 611.) The consent was required by the provisions of section 100.2 of the Streets and Highways Code because the highway had been declared a freeway. The court concluded: "Since, in respect to the *before* condition of the property, the state had not acquired all of defendants' abutters' rights of access and since defendants had unrestricted easements of access at the four openings, the situation not involving the establishment of

*new* openings, we think that defendants could reasonably expect that any necessary consent of the California Highway Commission to the connection of a public road or street with the freeway at the particular opening would in all probability be obtainable and that considered in its totality, defendants' theory of valuation as to the uses to which the land might have been developed was reasonably probable and not entirely remote or speculative.

"There is another aspect to this problem which must not be lost sight of. The present issue, as we have repeatedly emphasized, involves the land *only* in its *before* condition. We must therefore measure the factor of reasonable probability by a view in retrospect and reach a just resolution of an issue dealing with what 'could have been.' Under these circumstances we do not believe that the condemning authorities, having left to the abutting owners four unrestricted rights of access, can in a subsequent proceeding to acquire all such rights, claim that they are restricted rights because it is within the absolute power of the condemnor to withhold consent to their use as connections for a public road or street. This seems to have been the view of the learned trial judge. To countenance this argument would be in effect to permit the condemnor to accomplish indirectly a substantial impairment of the abutter's vested property rights without compensation." (*Id.*, at p. 614, and see p. 610, fn. 5.)

So, in this case, if the condemnor is permitted to revoke the license to enter the highway at the point bargained for in 1960 and to relegate the owners' access to a point or points on the boundary which would not permit equal utilization of the property, the owners will be deprived of the benefit of that bargain without just compensation.

The condemnor further relies on the principle that "the state cannot abdicate or bargain away its police power even by express grant." (*Caminetti* v. *Pac. Mutual Life Ins. Co.* (1943) 22 Cal.2d 344, 362 [139 P.2d 908]; and see *Acker* v. *Baldwin* (1941) 18 Cal.2d 341, 345 [115 P.2d 455]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 598 and 602-603 [138 P. 79]; and *Laurel Hill Cemetery* v. *City & County of San Francisco* (1907) 152 Cal. 464, 475 [93 P. 70, 14 Ann., Cas. 1080, 27 L.R.A. N.S. 260].)

"In the proper exercise of its police power in the regulation of traffic, a state or county may do many things which are not compensable to an abutting property owner, such as construct-

ing a traffic island, placing permanent dividing strips which deprive an abutter of direct access to the opposite side of the highway, painting double white lines on the highway, or designating the entire street as a one-way street. (*McDonald* v. *State,* 130 Cal.App.2d 793, 799 [279 P.2d 777]; *People* v. *Sayig,* 101 Cal.App.2d 890 [226 P.2d 702]; *Holman* v. *State,* 97 Cal.App.2d 237 [217 P.2d 448]; *Beckham* v. *City of Stockton,* 64 Cal.App.2d 487 [149 P.2d 296].)" (*People* ex rel. *Department of Public Works* v. *Russell* (1957) 48 Cal.2d 189, 197 [309 P.2d 10]; and see *People* ex rel. *Department of Public Works* v. *Ayon* (1960) 54 Cal.2d 217, 224 [5 Cal.Rptr. 151, 352 P.2d 519]; *People* ex rel. *Department of Public Works* v. *Presley* (1966) 239 Cal.App.2d 309, 314 [48 Cal. Rptr. 672]; *City of Berkeley* v. *Von Adelung* (1963) 214 Cal.App.2d 791, 793 [29 Cal.Rptr. 802].)

The purported regulation here, revocation of location of place of ingress and egress fixed by contract, is not within the situations covered in the latter cases. Insofar as the former cases are concerned, the question is not whether the state is estopped to exercise the police power, i.e., revoke the contractual encroachment right because of new traffic demands, but whether, if it does, a person whose rights or privileges are thereby curtailed may recover compensation.

In *People* v. *California Fish Co., supra,* the court stated: "It is to be understood, of course, that if the state has sold tide lands subject to the public easement, prior to making improvements thereon for navigation, as it may do, it cannot, upon putting in force a plan for the subsequent improvement thereof, retake the absolute title without compensation" (166 Cal. at p. 599). So where the state in the exercise of its police power imposes uniform rates on a utility and abrogates the rights of one with prior contractual rights, it has been suggested that the latter be entitled to compensation. (See *Lamb* v. *California Water & Tel. Co.* (1942) 21 Cal.2d 33, 43-44 [129 P.2d 371]; and *Law* v. *Railroad Commission* (1921) 184 Cal. 737, 741-742 [195 P. 423, 14 A.L.R. 249].)

Moreover, the rights conferred upon the owners by the 1960 agreement may be likened to a reservation in a grant of property to a governmental agency. Such reservations will be respected and a breach of the conditions by the governmental entity will entitle the grantor to relief. (See *Pedro* v. *County of Humboldt* (1933) 217 Cal. 493, 496-497 [19 P.2d 776]; *Wofford Heights Associates* v. *County of Kern* (1963) 219

Cal.App.2d 34, 39-41 [32 Cal.Rptr. 870]; *Marshall* v. *Standard Oil Co.* (1936) 17 Cal.App.2d 19, 29 [61 P.2d 520]; and *Hill* v. *City of Oxnard* (1920) 46 Cal.App. 624, 632-635 [189 P. 825].)

In *Wofford Heights Associates* it was contended that the grantor's reservation of the right to have pipes in the roadway was subject to an existing ordinance requiring relocation of structures placed in the road. The court stated: "But this argument fails to give due weight to the fact that the property right in the easement has at all times been held by plaintiffs and their predecessors in interest and that the police power does not give a county the power to take property without due process of law. (*Hill* v. *City of Oxnard, supra,* 46 Cal.App. 624, 632-636.)" (219 Cal.App.2d at pp. 41-42.) [6]

From the foregoing it is concluded that if the state wishes to exercise its reserved or police power to abrogate contractual rights it created at the time it acquired the real property to which those rights relate, it must give compensation for the rights which it takes.

█ The state further asserts that there is no right of ingress and egress under the 1960 contract because it was not to come into being until the improvements were constructed. Since the state failed to construct the contemplated improvements and revised its plans, the owners' rights never matured. A promisee cannot recover where he has failed to perform a condition precedent to the accrual of the promisor's obligation (Civ. Code, §§ 1439, 1434, 1435, 1436 and 1437), or, as noted by appellant, where a third person has failed to perform a bargained for condition precedent to the accrual of the promisor's obligation. (*Cochran* v. *Ellsworth* (1954) 126 Cal.App.2d 429, 439-440 [272 P.2d 904].) It is, however, a novel doctrine which asserts that the promisor by failing to perform can escape liability under his contract, and still retain the consideration he received. (See *Gavina* v. *Smith* (1944) 25 Cal.2d 501, 505 [154 P.2d 681].)

█ A more serious question is whether the owners, if damaged by the failure of the state to perform the work as

---

[6] Compare *County of Contra Costa* v. *Central Contra Costa Sanitary Dist.* (1960) 182 Cal.App.2d 176 [5 Cal.Rptr. 783], wherein a sanitary district whose sewer line easement was subsequently encompassed in a road, could not be forced to relocate, with the general requirement that those placing structures in a street relocate them on demand. (Sts. & Hy. Code, § 680; *State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699 [111 P.2d 651]; *County of Contra Costa* v. *Central Contra Costa Sanitary Dist.* (1964) 225 Cal.App.2d 701, 703-704 [37 Cal.Rptr. 767].)

contemplated in 1960, should be relegated to an action for damages (see *People* ex rel. *Department of Public Works* v. *Schultz Co.* (1954) 123 Cal.App.2d 925, 935-936 [268 P.2d 117]), or whether the court should assume that the "before" condition for the instant action was the property in the condition which it would have been in had the 1960 improvements been constructed. The former solution was discussed at the trial, and the owners even sought leave to amend to allow recovery for such loss as might have been sustained.

Ultimately the case was tried on the theory that the "before" condition of the property was the situation it was in after the 1960 agreement and sale, subject to the assumption that the improvements contemplated at that time would be constructed. This appears to be a proper extension of the general rule that in evaluating the "after" condition to determine the award, it should be assumed that the improvement will be carried out as proposed. (*People* ex rel. *Department of Public Works* v. *Ayon, supra,* 54 Cal.2d 217, 229; *People* ex rel. *Department of Public Works* v. *Silveira, supra,* 236 Cal. App.2d 604, 621; *People* ex rel. *Department of Public Works* v. *Schultz Co., supra,* 123 Cal.App.2d 925, 932-933.) It prevents the condemnor from paying twice for the same damages, and yet permits the property owner to recover for any damages attendant to the additional taking.

██ Finally, the state claims there can be no recovery for loss of access because no taking of access or abutters' rights was authorized (see fn. 5, *supra*). The owners concede that the abutters' legal right to access is not in issue, but they contend that the additional condemnation, because of the property taken and the shape in which it has left the residue, has not only deprived them of access at a place designated in the 1960 agreement, but also of practical access.

There may be impairment of access by the construction of the work of improvement itself. (*People* v. *Ricciardi* (1943) 23 Cal.2d 390, 397 and 403-404 [144 P.2d 799].) If there is a legally cognizable impairment of access which should properly be considered in computing severance damages, the condemnor cannot escape liability because the resolution of intent or the complaint fails to provide for condemnation of abutters' rights. If the state subsequently seeks to acquire the legal right of access it would be free to, and undoubtedly would attempt to show that the loss of the legal access resulted in little or no depreciation of the value of the property remain-

ing because the physical access to the property in its condition after the 1963 take was difficult and restricted because of the road pattern. (*See People* ex rel. *Department of Public Works* v. *Murray, supra,* 172 Cal.App.2d 219, 230.)

It is concluded that the owners were entitled to compensation for the loss of the rights they contracted for under the 1960 agreement, and such other impairment of access as was compensable. Attention is now directed to the rulings of the court of which complaint is made.

*General Rulings of the Trial Judge*

The state seeks to predicate error upon the general rulings of the court pronounced in chambers. The statements of the trial judge in reference to legal theories cannot furnish grounds for appeal until they are translated into judicial action. They may be referred to here, however, for the light they throw upon the specific rulings, made upon objections advanced by the condemnor, which are now under attack.

The question of the legal interpretation of the 1960 agreement first arose in connection with discussion of condemnor's objection to the owners' use of a map showing potential development of the property in its condition prior to the 1960 take. The court sustained the objection, and observed that it could not allow any evidence to show dimunition of the value of the land by reason of the 1960 transaction because that was settled by the prior contract. Discussion then turned to the effect of the failure of the state to perform any construction—neither the widening, the connecting highway, nor the road approach—in accordance with the 1960 plan. At that time the judge observed that the owners could not assert in this action any damages to the property resulting from the failure to complete the 1960 improvements as proposed, but that they could argue the difference between what the state proposed to do (1960) and what they propose to do (1963).

The question of the obligation of the condemnor was further raised by examination of the owners' engineer concerning a "blurred out" or erased road appearing on a map of the property which was offered to show its potential development. This blurred out roadbed ran from the northerly bulge in the connecting road as proposed in 1963 (the approximate location of the cul-de-sac under the first stage of construction under the 1963 plan), across the lands of others to the easterly side of the DiTomaso property some distance away from the existing and proposed highways. The witness testified that

it was a proposed extension of Cottle Road "proposed by the State of California" to the San Jose City Planning Department. The condemnor interpreted the testimony as an indication that the road was to be constructed by the state. The objection was sustained, the testimony was stricken to that extent, and the court repeated its admonition that this off-site road was not part of the case.

The effect of the 1960 agreement was also adverted to in connection with condemnor's motion to strike the testimony of one of owners' appraisers. The judge observed that in both the "before" and the "after" condition the owners had a right of access, subject to reasonable control of the traffic by the state, and that in addition in the "before" condition they had contract or agreement so they could get on the Monterey Road.

Finally, in the discussion concerning the instructions, the judge observed: "the Court . . . is . . . ruling that the taking, the present taking is depriving the DiTomasos of a contractual right to a road approach, and a connection with that road approach over whatever may have been legally permitted before subject to a State, County and City zoning, and other allowable uses, and the right to encroach upon the highway at the point indicated in the contract."

"[W]hether or not they could have used that road approach for a public road, subdivision, et cetera, I don't know and I am not ruling on it. That is a matter of fact for the jury to determine in establishing the highest and best use of the land."

*The Instructions*

The state complains of the incorporation of the foregoing rulings in the instructions to the jury. At the request of the defendant, the court charged the jury as follows: ["Defendants' Instruction No. 25"] "You are instructed that it is the province of this Court to determine, and this Court has determined that the landowners' right of direct access will be *somewhat impaired* by the taking proposed by the State of California Department of Public Works *by the taking of the road approach* and the construction of the improvement in the manner proposed. By this, I instruct you that you are to assume that it is a fact that the landowners' right of ingress and egress which is special to the defendants as abutting landowners on a public highway by reason of the 1960 agreements *may have been impaired.*

"You are instructed that it is your province to determine the extent of the impairment caused by the taking and the construction of the improvement in the manner proposed and that the extent of such impairment determined by you shall be the measure of compensation in damages to the property not actually taken but injuriously affected." (Italics added.)

["Defendants' Instruction No. 57"] "You are instructed that it is the settled law that the defendants have two kinds of rights in the public highway. The first of these rights is a public right which the defendants enjoy in common with all other citizens to utilize the highway for the purposes for which it is constructed. As abutting landowners, the defendants have a special right of easement and user in the public road for access purposes, and this is a property right which cannot be damaged or taken away from them without due compensation. . . .

"You are further instructed that pursuant to the contract of February, 1960, the defendants enjoyed and were possessed of an additional right to access over a road approach to a State highway from their real property and that the State Department of Public Works, pursuant to such contract, had agreed to the construction of said road approach and maintenance by DiTomaso thereafter as an encroachment upon the public highway.

"You are further instructed that said road approach for which said encroachment was allowed by the State Department of Public Works, was allowed by said Department of Public Works pursuant to its authority under Section 670 of the Streets and Highways Code of the State of California, and you are to assume that it is a fact that said road approach at that time was compatible with the safe use of the highway at said point."

Insofar as condemnor's objections are predicated upon the nonexistence of any rights under the 1960 agreement the question is resolved by what has been set forth above. The instructions as a whole fairly set forth the respective rights and obligations of the parties as they existed after the 1960 agreement and as they were affected by the present condemnation.[7]

---

[7]The instructions in question were preceded by the following:

["Plaintiff's Instruction No. 53"] "In determining the damage, if any, to the remaining property resulting from the limiting of access, the only damage recoverable is that which flows from impairment of the property owner's right of access. You are to disregard any conjectural, remote or speculative elements and consider only the damage, if any,

Condemnor complains that the court failed to find that there was a substantial impairment of access. In *Breidert* v. *Southern Pac. Co., supra,* the court observed: "To designate the right, however, is not to delineate its precise scope. Not every interference with the property owner's access to the street upon which his property abuts and not every impair-

which flows with reasonable certainty from the impairment of the right of reasonable ingress and egress to and from the property and which decreases its market value.

"You are also to disregard depreciation in market value, if any, caused by diversion of traffic, if any, from the highway upon which the property abuts, for a property owner has no legal right in the flow of traffic passing his property."

["Plaintiff's Instruction No. 54"] "Although an owner of real property abutting upon an existing highway, has a right of access to and from the highway, this does not mean that an owner of abutting property is entitled, as against the public, to access at all points in the boundary between the land and the highway.

"Such owner is entitled only to reasonable and convenient access to his property, considering all the uses to which the property is adapted and available."

Between the two instructions quoted in the text the court stated:

["Plaintiff's Instruction No. 56"] "You are to assume that defendants had the legal right of ingress to and egress from the State highway to their adjacent land prior to this condemnation action. These rights of ingress and egress are commonly called access rights. You are also to assume that when the State has constructed the improvement as it presently proposes the defendants will likewise have such rights of access to and from the new highway."

Following "Defendants' Instruction No. 57" the court gave:

["Plaintiff's Instruction No. 58"] "You are further instructed that the terms of the 1960 Right-of-Way Contract in evidence herein and executed between the parties hereto is not a matter for your intrepretation, but that such interpretation is a matter of law and has been determined by the Court.

"You are further instructed accordingly that the paragraph of said contract whereby the State agreed to construct a road approach at the time of construction eliminated the necessity for defendants to apply for an encroachment permit at that point of access and specified that the State, rather than the defendants, would undertake the expense of constructing the encroachment.

"You are further instructed that once the encroachment would be constructed it would be deemed to be an encroachment under permit upon the State highway in accordance with and subject to the laws of the State of California, and the rules and regulations of the Division of Highways, Department of Public Works of the State of California, and under the law the encroachment could be ordered to be removed or relocated upon 5 days notice if changed traffic conditions and traffic safety reasonably required such removal or relocation of the encroachment."

["Plaintiff's Instruction No. 59"] "You are instructed that the Court is not ruling that the road approach referred to in the 1960 Right-of-Way Contract may necessarily be connected to a city street, county street or private road or driveway. What the road approach may foreseeably be connected to and the reasonable possibility of such connection is a fact for your determination under the evidence."

ment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation. Such compensation must rest upon the property owner's showing of a *substantial impairment* of his right of access to the general system of public streets.

"The determination of whether such substantial impairment has been established must be reached as a matter of law. The extent of such impairment must be fixed as a matter of fact. The cases have consistently held that the trial court must rule, as a matter of law, whether the interference with access constitutes a substantial or unreasonable impairment." (61 Cal.2d at pp. 663-664 [fn. omitted]; and see *People* v. *Ricciardi, supra,* 23 Cal.2d 390, 402-403; *People* ex rel. *Department of Public Works* v. *Presley, supra,* 239 Cal.App.2d 309, 313; *People* ex rel. *Department of Public Works* v. *Murray, supra,* 172 Cal.App.2d 219, 227-228; *People* v. *Sayig* (1951) 101 Cal.App.2d 890, 902 [226 P.2d 702].)

The court did use the expression "somewhat impaired" in connection with the taking of the road approach, and the phrase "may have been impaired" in connection with the owners' general right to ingress and egress. A fair reading of all of the instructions indicates that the court, in leaving to the jury the factual question of the extent of the impairment, in effect did determine that there was a substantial impairment by "the taking of the road approach and the construction of the improvement in the manner proposed." (See *People* v. *Ricciardi, supra,* 23 Cal.2d at p. 403.) The state cannot complain because the instruction was couched in language designed to leave to the jury the greatest latitude in determining the extent of the impairment. The latter question, as hereinafter discussed, depended upon the resolution of the conflicting evidence as to the feasibility of subdividing the property with a street layout as assumed by the owners' appraisers.

*Denial of the Motion to Strike the*
*Testimony of Owners' Appraiser*

 Condemnor moved to strike the testimony, as to severance damages, of the first appraiser called by the owners on the ground that his testimony was predicated upon the erroneous assumption that legal and practical access to the property was being acquired by the state.

If the testimony reflects that the witness' opinion as to value is based upon improper considerations and is merely

speculative it should be stricken from the record and withdrawn from the consideration of the court or jury. (*County of Santa Clara* v. *Curtner* (1966) 245 Cal.App.2d 730, 752-753 [54 Cal.Rptr. 257]; *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Board* v. *Reed* (1963) 215 Cal.App.2d 60, 70 [29 Cal.Rptr. 847]; and see *People* v. *Dunn* (1956) 46 Cal.2d 639, 641 [297 P.2d 964]; *People* ex rel. *Department of Public Works* v. *Alexander* (1963) 212 Cal.App.2d 84, 91 [27 Cal.Rptr. 720]; and *City of Stockton* v. *Ellingwood* (1929) 96 Cal.App. 708, 716 [275 P. 228].)

The question was extensively argued and the witness' testimony was reviewed, but no ruling was made by the court. It is questionable whether the state may now raise this question. The right to object to the admission of testimony may be waived by failure to press for a ruling on the motion to strike. (Witkin, Cal. Evidence (2d ed. 1966) § 1303, pp. 1205-1206.)

In any event, a review of the testimony of this witness reveals statements from which it may be deduced he was talking about the impairment of practical and actual access (not legal access) because it would no longer be practical to bring a public street in from the front of the property after the second taking.

The witness' assumption that it would be possible to have such access before the take is governed by the discussion of the 1960 "approach road" contract, *supra,* and of the maps, *infra.*

Under the foregoing circumstances there would be no prejudicial error in denying the motion to strike. (See *People* v. *Dunn, supra,* 46 Cal.2d 639, 641-642; *People* ex rel. *Department of Public Works* v. *Alexander, supra,* 212 Cal.App.2d 84, 92-93; *People* ex rel. *Department of Public Works* v. *Logan* (1961) 198 Cal.App.2d 581, 587-588 [17 Cal.Rptr. 674]; and *People* v. *Loop* (1954) 127 Cal.App.2d 786, 800 [274 P.2d 885].)

*Owners' Design Plans*

At the trial the owners produced several design plans of their property which showed the claimed potential development of the property as a subdivision, including street layouts which indicated that Cottle Road would be extended through the property and intersect Monterey Road. These plans or maps were identified by an engineering draftsman employed by the owners' civil engineers and land surveyors. He testi-

fied that they were prepared under the direction of his employers.

The first map offered purported to show proposed development of the property in its state prior to the 1960 take. The condemnor's objection to the use of this map was sustained. A marked up area map allegedly obtained from the San Jose City Planning Commission met a similar fate. The record reflects that none of the remaining documents were received in evidence.[8] They were, however, apparently placed on a display board and exhibited to the jury. The defendant only interposed objections to two of these plans.

The first, Exhibit H, purported to show the property in the condition after the 1960 take. The proposed subdivision shows a road system consisting of a ''Cottle Road'' running from the rear of the property, through roughly the center of the property, to the easterly end of the 221 feet of frontage which remained on Monterey Road after the 1960 take. This plan, and each of the others as well, was coordinated in the rear part of the property with a dedicated right of way for Cottle Road, which was shown on all general plats of the area as running northerly parallel to Bayshore Highway from the center of the north of subject property, and with the street plans for an approved subdivision lying adjacent to the westerly side of the rear segment of the boomerang.

The state's objection went to the existence of blurred or erased lines on the exhibit which showed the line of the 1963 take and also the proposed link with the connecting road off of the DiTomaso property which has been mentioned above. It was made on the ground that the testimony erroneously indicated that the state would construct such a road. The court admonished the jury that there was no evidence of the existence of such a road, and the witness explained that it was a proposal received by the city planning commission from the state.

It subsequently developed that a copy of this plan of the area was presented to the advisory committee of the Santa Clara County Planning Commission on April 12, 1963, and was reviewed at a meeting on April 24, 1963. Under date of

---

[8]From the record it would appear that the court and counsel proceeded on the erroneous theory that plats or plans received for limited purposes, such as to illustrate proposed development, or to show the location of comparative sales, should only be marked for identification even though they were exhibited to the jury and were available for its inspection.

April 26, 1963, the owners were advised by letter of certain conditions which would be prerequisite to subdivision approval. These included: "Access to Monterey Road at point shown on map must be approved by State Department of Highways prior to tentative approval." This letter, and the written comments of owners' engineer in respect thereof, were received in evidence and read to the jury. The condemnor itself produced and exhibited a copy of the same map from the files of the planning commission. On this state of the record no objection can be entertained to the jury's consideration of Exhibit H.

■ Objection was also interposed to Exhibit P a "Neighborhood Map," which allegedly was obtained from the San Jose City Planning Department, on the ground that it purported to show a street pattern—by dotted lines—through the northerly end of the subject property and then out over the property of others to meet the proposed connecting road at roughly the same position as noted on the blurred lines on Exhibit H. The owners limited their offer to using the map for the purpose of showing its relationship to other properties in the neighborhood, and the court accordingly instructed the jurors to disregard the dotted lines of the proposed connection.

Whether designedly or fortuitously, the owners, prior to the commencement of this action, had never received express approval or disapproval of the development of their property in a manner which would permit a public street to intersect Monterey Road at or near where Cottle Road came in from the south. The question, therefore, is what " 'could have been' " (see *People* ex rel. *Department of Public Works* v. *Silveira, supra,* 236 Cal.App.2d 604, 614) if the condemnation of the additional property and the change in the nature of the plans for the improvement had never occurred.

The condemnor presented cogent and pursuasive testimony from state, county and city officials that under the 1960 status of the property the traffic hazards and development of the road system under the then existent plans would preclude approval of any plan of development which permitted another public street to enter on Monterey Road, or on the then proposed connecting road, from the subject property.

On the other hand, the 1958 alignment, the contract in 1960, the location of the property between the approved portions of Cottle Road to the north and the intersection on

Monterey Road, the testimony of owners' engineers and appraisers regarding their conversations with public officials at county, city and state levels, and the fact that other offset intersections existed in the area, created a conflict with the evidence produced by the state.

Condemnor insists that it was forced to pay damages predicated upon the basis of nonexistent streets, and that the jury should not have been permitted to view the exhibits produced by the owners because they were inflammatory. (See *People* ex rel. *Department of Public Works* v. *Alexander, supra,* 212 Cal.App.2d 84, 93-94; and *People* v. *Olsen* (1930) 109 Cal. App. 523, 533 [293 P. 645].) The failure to make a proper objection has already been noted. The record further reflects that the site maps which were exhibited by the various appraisers were copies of maps of the city planning commission and reflected the location of the property between two extremities of Cottle Road.

A reading of the record fails to reveal that the jurors were led to believe that there was a road in existence or approved across the subject property. The whole dispute centered upon whether approval of such a road was plausible and probable and would be considered as such by a prospective buyer. (See *People* ex rel. *Department of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352 [19 Cal.Rptr. 473, 369 P.2d 1]; *People* v. *Dunn, supra,* 46 Cal.2d 639, 642; *City of Los Angeles* v. *Hughes* (1927) 202 Cal. 731, 733 [262 P. 737], overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; and *People* ex rel. *Department of Public Works* v. *Silveira, supra,* 236 Cal.App.2d 604, 611-612.) The court properly instructed the jurors that the maps and plans were limited to showing the adaptability and feasibility of the development upon which owners' appraisers predicated their valuations. (See *Buena Park School Dist.* v. *Metrim Corp.* (1959) 176 Cal.App.2d 255, 262-263 [1 Cal. Rptr. 250].) The resolution of the dispute was properly left to the jury under the instructions discussed above.

*Denial of the Motion to Exclude*
*Evidence of the State's Design Plan*

■ One of the appraisers for the owners testified that he reviewed the history of the area involving the Cottle Road intersection and the proposed connecting road with an employee of the city planning department and reviewed the plans and correspondence it had on file. Reference was made

to a Division of Highways' plan showing Cottle Road going straight up into the subject property with a turn off to the right, presumably to connect with Ford Road, after it got up into the property. The court, on condemnor's objection, excluded the plan, but permitted the witness to refer to it as part of the background upon which he based his testimony. The witness thereafter testified over objection that there existed in the city's files a Division of Highways' map which showed Cottle Road crossing Monterey Road with four moving lanes and two eight-foot lanes on either side for parking and sidewalk curb, with the connecting frontage road coming in further to the north. He testified that the map, which was referred to as an incomplete design study of the state, was one of several factors which led him to believe that a road into the subject property would come into being.

Condemnor equates the foregoing with an attempt to increase the value of the property being taken by considering its value as though the improvement was made. "It is the law, as stated by appellant, that in arriving at a determination of the market value of land which is the subject of a condemnation action, it is not proper to consider the increase, if any, in the value of such land by reason of the proposed improvement which is to be made on the land by the condemnor. (See *San Diego Land etc. Co.* v. *Neale,* 78 Cal. 63, 75 [20 P. 372, 3 L.R.A. 83]; *United States* v. *Miller,* 317 U.S. 369, 378 [87 L.Ed. 336, 345, 63 S.Ct. 276, 147 A.L.R. 55, 64].)" (*County of Los Angeles* v. *Hoe* (1955) 138 Cal.App.2d 74, 78 [291 P.2d 98].)

This contention overlooks the thrust of the proferred testimony. It was offered not to show that the state's plans in 1963 would enhance the value of the property taken, but to show the basis for the appraiser's opinion and incidently to demonstrate that, prior to 1963, consideration had been given to designing a crossroad similar to that which the owners were claiming was feasible and practicable after the 1960 take and before the 1963 condemnation.

It is perhaps significant that although the state subsequently presented as witnesses representatives from the Division of Highways, the county and the city, no attempt was made to deny the existence of such a plan, or qualify it as to its feasibility or with respect to the time of its preparation.

No prejudicial error is found in permitting the appraiser to testify as to the facts upon which his conclusions were based.

"An expert may detail the facts upon which his conclusions or opinions are based, even though his knowledge is gained from inadmissible or inaccurate sources. (*Bettes* v. *Southern Calif, etc. Exchange,* 144 Cal. 402 [77 P. 993]; *McElligott* v. *Freeland,* 139 Cal.App. 143 [33 P.2d 430].)" (*People* ex rel. *Department of Public Works* v. *Donovan, supra,* 57 Cal.2d 346, 352.)

*Reference to Loss of Legal Access*

 The attorney for the owners, in the course of discussing the progressive acquisitions by the state in his argument, posed the question, "How far are they going to build this?" He answered it by reference to recitals in the highway commission resolution which referred to a freeway and by telling the jurors that a freeway was defined as a state highway where there was no access at all, or limited or restricted access.

The condemnor promptly objected. The court, after observing that it believed the reference was to the over-all plan, and not the plan in front of the subject property, advised the jury, "the Court is not ruling and will not instruct that a freeway will be immediately in front of Mr. DiTomaso's property."

The question of the abutting owners' loss of their legal rights to access was not an issue here (see fn. 5, *supra*). The jury was so instructed (see fn. 7, *supra*). The maps before them indicated where legal access had been taken on the rear portion of the subject property adjacent to the Bayshore Highway, and where access was to be taken from the property of others between subject property and the main intersection. These matters were correctly alluded to by the witnesses, and there was no room for misunderstanding by the jury.

Misconduct of counsel in argument may furnish grounds for reversal (see *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141, 143 [45 Cal.Rptr. 313, 403 P.2d 721]; and *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 394 [38 Cal. Rptr. 183]). The instant record, however, fails to show that the court's admonition would fail to cure any erroneous implication from the argument of counsel even if it be deemed misconduct.

*The Testimony of the Owners' Rental Payments*

 Mr. DiTomaso testified that it would be handy and more convenient to replace the improvements if he were to

continue the orchard operation, and that it was difficult to operate the orchard when he did not live there because it was necessary to watch the temperature and smudge in cold weather, and also necessary to be on the premises to hire workers as they came by. He was asked what he was paying for substitute rental property, and over the objection of condemnor was permitted to testify that he was paying $135 per month for an apartment.

"Any increase in the personal difficulties of a landowner, or his lessee, as such, by reason of the taking, apart from the market value, is not a proper test of damages; . . ." (*People ex rel. Department of Public Works* v. *Lundy, supra,* 238 Cal.App.2d 354, 359.) Nevertheless, it is difficult to ascertain how this testimony affected the result of the case. The trial court at first sustained the objection, but changed its ruling on the apparent theory that it might present an alternative to the damages for the loss of the improvements. The jurors were correctly instructed as to damages, and it will not be inferred that this error affected their computations. Condemnor has failed to show how it was prejudiced by the admission of this evidence.

In conclusion it may be noted that unless this court can find that, as a matter of law, it was not feasible or practicable to put in a road intersecting Monterey Road or the connecting highway after the 1960 take, the judgment should be affirmed. The trial court properly recognized that there was a loss of physical access by the 1963 additional take, even though it was only a fixed location for a driveway. There was also additional loss of physical access by the substitution of 173 feet along Monterey Road and 425 feet along a curve, which for six years would abut on a cul-de-sac, in place of the former 220 feet on Monterey Road and 209 feet along the curve of a proposed constructed two-lane connecting road. The figures arrived at by the jury indicate that they rejected the restricted assumptions of the witnesses for the condemnor, and, as well, the grandiose plans envisioned by the experts for the owners. The final result is not inconsistent with the reasonable value of the property taken, and the loss to the defendants occasioned by the taking of the property over which they had hoped to enjoy the benefits of their 1960 bargain with the state.

The judgment is affirmed.

Molinari, P. J., concurred.